PEOPLE v FIGGURES

Docket No. 98856. Argued December 7, 1995 (Calendar No. 3). Decided May 21, 1996.

Ernest Figgures was convicted by a jury in the Muskegon Circuit Court, R. Max Daniels, J., of breaking and entering the occupied dwelling of his ex-wife with the intent to commit felonious assault and pleaded guilty of being a third-felony offender. The Court of Appeals, MURPHY, P.J., and MACKENZIE, J. (GRIFFIN, J., dissenting), affirmed in an unpublished opinion per curiam, finding that, although the trial court abused its discretion in permitting the prosecutor to engage in improper rebuttal, the error was harmless beyond a reasonable doubt (Docket No. 131600). The defendant appeals.

In an opinion by Justice RILEY, joined by Justices BOYLE, MALLETT, and WEAVER, the Supreme Court *held*:

No error was committed by the prosecution. The prosecutor properly impeached the defendant's claim that he was reconciling with the complainant by bringing forth in rebuttal evidence to the contrary. Because the remaining evidence was so overwhelming against the defendant, even if it was error to admit the rebuttal evidence, it was not decisive of the outcome.

1. Admission of rebuttal evidence is within the sound discretion of the trial judge and will not be disturbed absent a clear abuse of discretion. Because the scope of rebuttal is based on the trial judge's discretionary authority to preclude the trial from turning into a trial of secondary issues, it is the trial court that, of necessity, must evaluate the overall impression that might have been created by the defense proofs. This discretion flows from the trial judge's authority to exclude evidence that is substantially more prejudicial than probative pursuant to MRE 403.

2. Rebuttal evidence is admissible to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach it. The question whether rebuttal is proper depends on what proofs the defendant introduced and not merely on what the defendant testified about on cross-examination. The test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's

case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant. As long as evidence is responsive to material presented by the defense, it is properly classified as rebuttal, even if it overlaps evidence admitted in the prosecutor's case in chief.

3. In this case, once the defendant testified on direct examination that he and the complainant were reconciling, he opened the door to the presentation of further evidence bearing on the actual state of their relationship. The evidence introduced by the prosecutor responded to evidence and impressions raised by the defendant during direct examination. Admission of the rebuttal evidence was within the trial court's discretion, and that discretion was not abused. In the light of the overwhelming evidence presented during trial, any error in the presentation of the rebuttal evidence was not decisive of the outcome.

Affirmed.

Justice CAVANAGH, joined by Chief Justice BRICKLEY, and Justice LEVIN, dissenting, stated that the trial court abused its discretion by admitting improper rebuttal evidence, and the error was not harmless.

The majority misinterprets the relevant testimony to reach its conclusion that the trial court's admission of alleged rebuttal evidence was not erroneous. Furthermore, it impermissibly imposes its evaluation of witness credibility, and that on the wholly insupportable basis of mere quantitative superiority, to conclude that any error was harmless.

Rebuttal testimony may be used to contradict, repel, explain, or disprove evidence produced by the other party and tending directly to weaken or impeach the evidence. Eliciting a denial on cross-examination may not be used to inject a new issue into the case, nor may cross-examination.be used to revive the right to introduce evidence that could have been, but was not, introduced in the prosecutor's case in chief. The prosecution may not divide the evidence supporting its case by saving some of it for rebuttal.

The burden of proof in a harmless error analysis must be borne by the beneficiary of the error. In this case, the prosecutor offered police reports to rebut the defendant's testimony. Because the trial judge mistakenly characterized the defendant's testimony, he committed clear error, and his admission of the rebuttal evidence was an abuse of discretion. Even if the rebuttal evidence were relevant to motive and truthfulness, its admission still would violate the prohibition against division of the prosecution's evidence. Although the defendant arguably failed to object to the admission of the ex parte criminal injunctions, a plain, unpreserved error may be considered

for the first time on appeal where the error could have been decisive of the outcome of the case. Because witness credibility was the crucial factor in the evidence presented to the jury, the plain error committed by the trial court could have been decisive of the outcome and is properly considered.

The standard is not whether the error was decisive of the outcome, as the majority would have it, but whether the error could have been decisive of the outcome. Regardless of the standard used, the majority's application of it would be flawed because of the improper incursion on the exclusive realm of the factfinder: evaluation of credibility. The majority quotes prosecution witnesses at length and simply asserts that the testimony of these witnesses substantially and irrefutably disproves defendant's version of events, an inappropriate exercise of appellate review.

The defendant's credibility was the crux of his defense, a fact that heightens the prosecutor's burden to prove that there clearly was no reasonable possibility that the challenged evidence might have contributed to the conviction. The prosecutor failed to meet that burden. It is manifestly reasonable to assume that the official nature of the police reports and criminal injunctions might cause the average juror to give such evidence substantial credence, which would have significantly undermined the defendant's credibility, thereby contributing to the conviction. It is also reasonable to assume that the jurors would not be aware of the ex parte nature of these documents. Furthermore, the court's instruction on the challenged evidence virtually ensured that the jurors would improperly use the evidence because it admonished them to treat the evidence as substantive proof rebutting defendant's consistently mischaracterized testimony.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Tony Tague*, Prosecuting Attorney, and *Kevin A. Lynch*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Ronald J. Bretz* and *Lyle N. Marshall*) for the defendant.

RILEY, J. This Court is called upon to decide whether defendant was denied a fair trial by the admission of certain rebuttal evidence. We conclude that the rebuttal evidence was properly admitted.

Accordingly, we affirm the judgment of the Court of Appeals, but for the reasons stated in this opinion.

I

In August of 1981, Linda Figgures married defendant. Unfortunately, the marriage was a troubled one that ended in divorce on November 22, 1989. On the evening of February 2, 1990, defendant arrived at the Figgures' house and began to pound on the living room, dining room, and bedroom windows. Fearing for her life, Ms. Figgures telephoned the police. As she was giving the police her location, the phone went dead. Shortly thereafter, defendant entered through the front door.[1] He kicked in a bedroom door and confronted Ms. Figgures. According to Ms. Figgures, defendant held a hammer above his head and violently swung it at her. She responded by taking a baseball bat and jamming it in his stomach. A struggle ensued, and Ms. Figgures was thrown backward across a table onto a couch. Defendant fled when the police arrived. The arriving police officers observed the broken door and the cut telephone wires.

Defendant, however, tells another story. He admits that he was not on the best terms with his ex-wife and that he had come over on the night in question to get some of his possessions. He testified that he still had a key to the front door and he used it to let himself in. After exchanging words with the complainant, he admits that he knocked down the bedroom door.[2] He claims that as a result of this entry, his hammer

---

[1] It is uncertain whether he had a key or he forced his way in.

[2] Apparently, the front door of this duplex leads to an interior hallway that borders on the complainant's living quarters in the duplex. Complainant's bedroom door opens into this hallway.

fell from his tool belt. As he was picking it up and placing it into his tool belt, the complainant struck him with a baseball bat. Upon seeing the police, he fled. Defendant contends that he had no intention of committing any felony at this house and his only reason for being there was to retrieve some of his possessions.

Subsequently, defendant was captured by the police and brought to trial. At trial, the prosecutor questioned him about the police reports and injunctions that were filed against him. Defendant maintained that this line of questioning was improper and overly prejudicial. However, the judge allowed it. The prosecutor then offered a sealed criminal ex parte injunction against defendant, which was accepted. The judge instructed the jury that this evidence was only to be used to rebut defendant's claim that he and Ms. Figgures were getting along.

The jury found defendant guilty of breaking and entering an occupied dwelling with intent to commit felonious assault, and defendant was sentenced to seven to fifteen years in prison. Defendant, however, pleaded guilty to being a third-felony offender. As a result, Muskegon Circuit Court Judge R. Max Daniels vacated the earlier sentence and imposed a prison term of seven to thirty years. The Court of Appeals affirmed defendant's conviction in an unpublished per curiam opinion.

> Although the trial court abused its discretion in permitting the prosecutor to engage in improper rebuttal, we conclude, on the record before us, the error was harmless beyond a reasonable doubt. [Unpublished opinion per curiam of the Court of Appeals, issued February 1, 1994 (Docket No. 131600), p 1.]

Defendant petitioned this Court for leave to appeal, which was granted.[3]

II

The essence of this case at trial revolved around whether defendant intended to commit a felony once he broke into the house. Defendant argued that he had no intent to commit such a felony and that he went to the house only to retrieve his possessions. On direct examination, he testified that, since their divorce, he and complainant had made attempts at reconciling.

*Q.* After you moved, did you maintain any contact with Linda?

*A.* Yes, most definitely I did maintain contact with Linda. Linda was at my residence quite frequently and I was at her residence frequently.

*Q.* Did you ever try to reconcile with Linda?

*A.* Oh, yes. We tried to reconcile a number of times, and what would seem to happen was that we would get back together and it would be ten, twenty days or so and we would be separated again. At my own volition I would just leave again.

*Q.* Did that pattern continue up to February of this year?

*A.* Yes, it did.

*Q.* Can you give me the last couple times that you stayed for any length of time at Linda's house?

\*       \*       \*

*A.* I stayed at Linda's house December 8 of 1989 until December 21st of 1989. I stayed there January the 2nd of 1990 until January 20th or so of 1990.

*Q.* While you were back in December and January, did you have any of your property on the premises?

---

[3] 449 Mich 859 (1995).

*A.* Yes, I did. I had clothing there and I also had all my bedroom outfit (sic). I had my dishes, just extensive amount of clothing, my bedroom suite, dishes, a couple of chairs. I had a bench that I had made for my stereo unit, also.

*Q.* OK. During that period of time where [sic] you sleeping at that house—sleeping at that place on Sixth Street?

*A. Yes, I most definitely was sleeping with Linda. We were having a conjugal relationship. It was just like being back in my marriage. I was trying to get back together with Linda and see if we couldn't work our problems out.* I was seeing if we couldn't in fact go through some counseling and alleviate the problems that existed between us. [Emphasis added.]

According to defendant, this reconciliation process began soon after their separation.

*Q.* Just for clarification, you testified that you were trying to reconcile your marriage in December of '89?

*A.* Yes. At the time that I was living with Linda, yes.

*Q.* And you were trying to reconcile in July, in any previous months?

*A.* Yes. Linda—Yes. Linda saw me quite frequently. Linda was at my residence quite a few times.

*Q.* When did this start?

*A.* This has been ongoing ever since our separation.

On cross-examination, the prosecutor attempted to impeach defendant's testimony by asking if there were police reports filed against him showing that he and the complainant were *not* on happy terms.[4]

---

[4] Numerous police reports were discussed during cross-examination, but none of them were ever officially admitted as evidence. On July 20, 1989, a police report was filed describing an assault on complainant where defendant punched her in the nose. On July 24, 1989, a police report was filed describing a disagreement at a restaurant where defendant allegedly slashed the tires of complainant's car. On November 26,

> *Q.* Isn't it true in fact that you have been harassing her
> over the past year?
> *A.* No, it is not true.
> *Q.* That you have been following her?
> *A.* No, I haven't been following her.
> *Q.* That there have been several police reports made?
> *A.* There has [sic] been police reports.

The prosecutor then submitted as evidence an ex parte criminal injunction filed against defendant on December 18, 1989.[5] Defendant contends that this manner of impeachment was improper because on cross-examination he had admitted that he and complainant had their ups and downs.

> *Q.* So you are not saying that you were rocky—In July
> you were rocky, also?
> *A.* Yes. We were having a rocky relationship, but Linda
> always tended to come back to me or find me or come over
> to my house.
> *Q.* What do you mean when you say "rocky"?
> *A.* What do I mean when I say "rocky"?
> *Q.* Uh-huh.
> *A.* We had our ups and downs.

Defendant contends that this admission prevented the prosecutor from being able to impeach him. We disagree. Defendant testified at length that he and complainant were reconciling and, in fact, had lived together amicably on two separate occasions: December 8 to 21, 1989, and January 2 to 20, 1990. He

---

1989, and December 17, 1989, police reports were filed describing defendant's harassment of complainant at her place of work. On December 19, 1989, a police report was filed stating that defendant cut complainant's phone lines.

[5] The date of this injunction is especially relevant because this was a time that defendant alleged to have been living with the complainant.

described these times in a favorable light comparing
it to marriage.

> *Yes, I most definitely was sleeping with Linda. We were
> having a conjugal relationship. It was just like being back
> in my marriage.*

Even though defendant admitted that he had a
"rocky" relationship with complainant this did not
change the essence of his testimony on direct exami-
nation regarding their reconciliation. Consequently,
the prosecutor was justified in rebutting defendant's
portrayal.

Admission of rebuttal evidence is within the sound
discretion of the trial judge and will not be disturbed
absent a clear abuse of discretion. *People v DeLano*,
318 Mich 557, 570; 28 NW2d 909 (1947); *People v Wil-
son*, 55 Mich 506; 21 NW 905 (1885). Because the
scope of rebuttal is based on the trial judge's discre-
tionary authority to preclude the trial from turning
into a trial of secondary issues, it is the trial court
that must, of necessity, evaluate the overall impres-
sion that might have been created by the defense
proofs. As the United States Supreme Court noted
over twenty years ago:

> A criminal trial does not unfold like a play with actors
> following a script; there is no scenario and can be none.
> The trial judge must meet situations as they arise and to do
> this must have broad power to cope with the complexities
> and contingencies inherent in the adversary process. To this
> end, he may determine generally the order in which parties
> will adduce proof; his determination will be reviewed only
> for an abuse of discretion. [*Geders v United States*, 425 US
> 80, 86; 96 S Ct 1330; 47 L Ed 2d 592 (1976).]

This discretion flows from the trial judge's authority to exclude evidence that is substantially more prejudicial than probative pursuant to MRE 403. See *People v Lavergne*, 4 Cal 3d 735; 94 Cal Rptr 405; 94 P2d 77 (1971); 22 Wright & Graham, Federal Practice & Procedure, § 5222, p 312.

Rebuttal evidence is admissible to "contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same." *DeLano, supra,* at 570, quoting *People v Utter*, 217 Mich 74, 83; 185 NW 830 (1921). See *People v Kelly*, 423 Mich 261, 281; 378 NW2d 365 (1985). The question whether rebuttal is proper depends on what proofs the defendant introduced and not on merely what the defendant testified about on cross-examination.

Contrary to the dissent's insinuation, the test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant. *People v Bettistea*, 173 Mich App 106; 434 NW2d 138 (1988); *Nolte v Port Huron Bd of Ed*, 152 Mich App 637, 645; 394 NW2d 54 (1986). As long as evidence is responsive to material presented by the defense, it is properly classified as rebuttal, even if it overlaps evidence admitted in the prosecutor's case in chief.

Once defendant testified on direct examination that he and the complainant were "reconciling," in an attempt to create the impression with the jury that he would not have assaulted the complainant because the two had been living together and getting along well in the months before the illegal entry, "he

opened the door to the presentation of further evidence bearing on the actual state of their relationship . . . ." *People v Schwerbel*, 638 NYS2d 198, 199 (NY App Div, 1996). The evidence introduced by the prosecutor responded to evidence and impressions raised by defendant during direct examination. Admission of the rebuttal evidence was within the trial court's discretion, and that discretion was not abused.

This conclusion is further justified by defendant's specific denial of having harassed complainant.

> . *Q.* Isn't it true in fact that you have been harassing her over the past year?
> *A.* No, it is not true.

This blanket denial exposed him to impeachment. Thus, we conclude that the prosecutor had every right to use the injunctions and police reports to show that defendant had harassed the complainant by following her, punching her in the nose, and slashing her tires outside a restaurant.

Moreover, any concern that the injunctions were used improperly by the jury at trial is dispelled because of the cautionary instruction given by the trial judge.

> I want to make something clear to the jury. It gets confusing here. These restraining orders—He is not charged with violation of the restraining order. He is not charged with any violation in connection with that. That's a different matter. That's a different court. The only purpose that these restraining orders were offered and the only reason I allowed them—to rebut his testimony that he said that we were reconciling and were getting along fine. That's the only purpose they're offered as to what was filed.

The dissent, however, argues that under *People v Losey*, 413 Mich 346, 352; 320 NW2d 49 (1982), and *People v Bennett*, 393 Mich 445, 449; 224 NW2d 840 (1975), it was error to admit this evidence. *Losey* and *Bennett* address

> [t]he other generally applicable rule governing the admission of rebuttal testimony[—]that "the device of eliciting a denial on cross-examination may not be used to inject a new issue into the case. Similarly, cross-examination cannot be used to revive the right to introduce evidence that could have been, but was not, introduced in the prosecutor's case in chief." [*Post* at 411.]

Specifically, in *Losey, supra* at 351-352, this Court stated "nothing in the defendant's case made [the prosecutor's rebuttal evidence] any more relevant to [the issue the prosecutor made in the case in chief]." Similarly, in *Bennett, supra* at 449, the Court noted that the prosecutor's rebuttal evidence did not "bear on an issue raised by the defense." These two situations simply are not relevant to the case at hand. While it is true that a denial cannot be elicited on cross-examination simply to facilitate the admission of new evidence, that is *not* what occurred here. On direct examination, defendant specifically stated that he was in the process of reconciling with complainant. Consequently, whether he was reconciling with her or harassing her at this time was already a part of the case *before* cross-examination. This line of questioning by the prosecutor did not inject a new issue into the case, instead, it served as the basis for a thorough and proper exploration regarding the veracity of defendant's prior testimony. As a result, the dissent's citation of *Losey* and *Bennett* is inapposite.

### III

Assuming there was error in the admission of this evidence, which there was not, that error was not decisive of the outcome. This Court noted in *People v Grant*, 445 Mich 535, 553; 520 NW2d 123 (1994), that where there is unpreserved[6] nonconstitutional plain error, the error will not be considered by an appellate court unless the error was decisive of the outcome or the case falls into the group of cases, yet to be defined, where prejudice is presumed or reversal automatic. Obviously, this case does not fit into the latter category.

Here, the error was not decisive of the outcome. It is undisputed that defendant broke into complainant's home. Defendant himself admitted this fact.

*Q*. The front door. What about the bedroom door?

*A*. The bedroom door? I hit up against the bedroom door.

*Q*. You hit up against it. What do you mean by that?

*A*. I hit up against it with my forearm.

*Q*. Enough to break the casing at the door?

*A*. The door opened.

*Q*. The door opened. By your force?

*A*. Yes, I did force the door open.

---

[6] At trial, only one criminal injunction was actually admitted and it was admitted without objection.

Your Honor, I would offer into evidence a document under seal. It's a criminal ex parte. It's an order for ex parte criminal injunction against this defendant. It was signed by Judge Kobza on December 18th. It's under seal.

*The Court*: Show it to the—Any objection?

*Mr. Hermanson*: None, your Honor.

*The Court*: Received.

Thus, there can be little dispute that defendant violently broke into complainant's bedroom. Numerous eyewitnesses substantially described the event in the same manner. Sandra Sladovnik, the complainant's daughter, testified:

> *Q.* Did he [defendant], before he went to the back door—did he go anyplace else around the house?
>
> *A.* He just was walking around the house. First he went to the back door and knocked on the door and then he went to the window and was looking in the windows. While he was at the back door I told my mom that Ernie was at the back door banging on the door. That's when she called the police.

> \*       \*       \*

> *Q.* So you heard a noise at the front door?
> *A.* Uh-huh.

> \*       \*       \*

> *Q.* OK. And then what happened after words were exchanged?
>
> *A.* He came through my brothers' room. He kicked the door down through my brothers' room.
>
> *Q.* Were you in a position where you could see him kick the door down?
>
> *A.* I seen him kick the door down, yes. He didn't see from—where I was from the outside, but I seen him come through the door.

> \*       \*       \*

> *Q.* What did you see her do with the bat?
>
> *A.* She was pushing, just trying to push him away.
>
> *Q.* And then what happened after she was pushing him with the bat?
>
> *A.* I guess—She got thrown over the table and the lamp and then the cops came and everything happened so quickly. My mom said, "Oh, good, the cops are here," and

then he just got scared or something and took off out the door.

## James Crews, complainant's companion that evening, testified about the swinging of the hammer.

*Q.* And can you tell—did he have anything in his hand?

*A.* He had a hammer.

*Q.* And how was he holding the hammer as he went through that door?

*A.* When he come in the door—in the door—he was raising the hammer. I don't know if he was going to go at her or me. I don't know which one, you know.

*Q.* Was he looking at you?

*A.* I couldn't really say. Couldn't say right now.

*Q.* And was he saying anything?

*A.* Was saying something, but I don't remember what it was, but I do know the hammer was raised a couple of times and I don't know if it was coming after me or her, but she had the bat to try to protect herself from the hammer.

*Q.* Was he swinging the hammer?

*A.* Yes.

*Q.* How many times did you see?

*A.* I saw at least twice.

*Q.* And what—How did Linda respond to the swinging of the hammer?

*A.* She kind of jabbed the bat at him and I think, from what I saw, when the bat went she was back on the floor and knocked over the lamp and the table right there and then—and by that time that's when the cops, the policemen, appeared.

## Michael Davis, Sandra Sladovnik's boyfriend, testified similarly.

*Q.* What did you first see?

*A.* I saw Mr. Figgures enter the room.

*Q.* Did he have anything in his hand?

*A.* Yes. He had a hammer in his hand.

*Q.* How was he holding the hammer?

*A.* Like above his head (indicating).

*Q.* Did you see him swing it?

*A.* Yes, I did.

*Q.* In what manner?

*A.* In a manner that he wanted to cause some serious injuries.

*Q.* Can you show the jury how he was swinging the hammer?

*A.* He had it above his head. He was coming in a downward motion, so (indicating).

*Q.* How many times did you see him do this?

*A.* Maybe two or three times. I am not real sure. It was two or three times.

Furthermore, defendant's own son, Germaine Figgures, testified that defendant had not lived with the complainant for over the past six or seven months.

*Q.* Did you reside with your mother at 1561 Sixth Street over a period of time?

*A.* Excuse me?

*Q.* Do you reside—live right now at 1561 Sixth?

*A.* Yes.

*Q.* How long did you live there?

*A.* For about six or seven months now.

*Q.* Continuously?

*A.* Uh-huh.

*Q.* At any time during those six or seven months did Mr. Figgures live at that address?

*A.* No.

*Q.* Was he welcome at that address?

*A.* No.

This testimony directly impeached defendant's testimony that he had been reconciling with the complainant and had lived with her intermittently.

By the end of the trial, the jury had defendant's admission that he broke down the door; the eyewitness testimony of complainant, James Crews, Sandra Sladovnik and Michael Davis; and the testimony of a police officer that the door had been knocked down and the telephone wires cut.[7] In the light of this overwhelming evidence, we are persuaded that any error in the presentation of this rebuttal evidence was not decisive of the outcome in this case.

IV

We conclude that no error was committed by the prosecution. The prosecutor properly impeached defendant by bringing forth evidence that defendant had a history of following the complainant and harassing her, both emotionally and physically. This evidence directly impeached defendant's claim that he was reconciling with complainant. Moreover, the evidence was so overwhelming against defendant that even if it was error to admit this evidence, the error was not decisive of the outcome. We affirm the judgment of the Court of Appeals, but for the reasons stated in this opinion.

---

[7] *Q.* What was the condition of that door?

*A.* Well, the door casing was broken and part of the latch was on the floor.

\*     \*     \*

*Q.* Did you inspect the phone wires?

*A.* Yes, I did.

*Q.* And how did they appear?

*A.* The telephone line coming into the house had been cut.

BOYLE, MALLETT, and WEAVER, JJ., concurred with RILEY, J.

CAVANAGH, J. (*dissenting*). In my opinion, the majority misinterprets the relevant testimony to reach its conclusion that the trial court's admission of alleged rebuttal evidence was not erroneous. Furthermore, the majority impermissibly imposes its evaluation of witness credibility, and that on the wholly insupportable basis of mere quantitative superiority, to conclude that any error was harmless. Accordingly, I dissent.

I

Defendant was charged with, and ultimately convicted of, breaking and entering an occupied dwelling with the intent to commit felonious assault,[1] and was sentenced to a term of seven to thirty years.[2]

A

It was conceded at trial that defendant illegally entered the home of the complainant, his ex-wife. The contested legal issue at trial was defendant's intent in doing so. The prosecution's theory was that defendant broke into the home with the intent to assault the complainant. Defendant's theory was that, after numerous unsuccessful attempts at reconciliation, he realized their relationship was over and that he went

---

[1] MCL 750.110; MSA 28.305.

[2] Defendant originally received a sentence of seven to fifteen years for the underlying charge, but, after pleading guilty to the supplemental information charging him with habitual offender, third offense, that sentence was vacated and defendant was resentenced to the seven- to thirty-year term.

to his former wife's residence solely for the purpose of reclaiming items of his personal property.[3]

The prosecution theory also included the allegation that defendant attempted to assault the complainant with a hammer. Defendant's version of the incident was that the hammer simply fell out of his tool belt and he picked it up, but that he never raised it in an attempt to assault the complainant.

The following excerpt from the prosecutor's cross-examination of defendant sets forth the context relevant to resolution of the specific legal question before us in this appeal:

Q. Mr. Figgures, you were friendly then in the month of July; is that true?

A. Pardon me?

Q. You were friendly with Linda. You were on a good, congenial, happy relationship with her in July.

A. No, we weren't. Our relationship ever since our separation has been quite rocky. Our whole marriage for the last few years has been quite rocky.

Q. So you are not saying that you were rocky—In July you were rocky, also?

A. Yes. We were having a rocky relationship, but Linda always tended to come back to me or find me or come over to my house.

Q. What do you mean when you say "rocky"?

A. What do I mean when I say "rocky"?

Q. Uh-huh.

A. We had our ups and downs.

Q. Isn't it true in fact that you have been harassing her over the past year?

---

[3] On cross-examination, the complainant testified that defendant had left some record albums and a television set at the residence, but claimed that they became her property when defendant failed to pick them up by a date allegedly established by a Judge Kobza.

*A.* No, it is not true.

*Q.* That you have been following her?

*A.* No, I haven't been following her.

*Q.* That there have been several police reports made?

*A.* There has [sic] been police reports.

*Mr. Hermanson:* I am going to object, Your Honor. I don't know if that's relevant to this proceeding. I think it's improper to be raising that.

*The Court:* Overruled. Go ahead.

*By Ms. Mulder:*

*Q.* That there have been several police reports made as to Linda complaining that you have been harassing her.

*A.* Yes. There have been some police reports made.

*Q.* In fact, on July 20th of 1989 a police report was made because you slugged her in the nose and caused her to bleed.

*A.* No.

*Q.* Do you recall that?

*A.* No, I don't.

*Q.* How about—Do you recall July 24th of '89 when you took her wallet at a restaurant, slashed her tires?

*Mr. Hermanson:* Your Honor, I don't think—I don't believe that kind of questioning is proper. If in fact there is . . .

*The Court:* What's your objection?

*Mr. Hermanson:* If in fact there's some report that's filed—I am not sure what this is being offered for. I think he's testified that there had been a rocky relationship. He's indicated there are police reports filed. I don't know that the nature or the extent of the police reports are admissible. If there was any conviction from that, they may have—that may have been an issue or a question, but I think that was discussed previously and there were none.

*The Court:* What purpose are they . . .

*Ms. Mulder:* I am offering for the purpose to rebut his testimony. He said that they were peaceful together during the period of July through January.

*The Court:* I will allow that for that purpose.

*Mr. Hermanson:* He also testified yes, there were police reports filed..

*The Court:* I will allow that for the purpose—because he indicated they were reconciling during that period of time and they were friendly. So go ahead.

Defendant was found guilty by the jury of breaking and entering an occupied dwelling with the intent to commit felonious assault.

B

In affirming defendant's conviction, the Court of Appeals stated:

Although the trial court abused its discretion in permitting the prosecutor to engage in improper rebuttal, we conclude, on the record before us, the error was harmless beyond a reasonable doubt.

In dissent, Judge GRIFFIN expressed his opinion that

[t]he inadmissible hearsay statements referred to in the police reports and in the ex parte injunctions were profoundly prejudicial to defendant. Under the circumstances of this case, I believe that there is a reasonable probability that the evidentiary errors affected the outcome of the trial.

I agree with the unanimous opinion of the Court of Appeals panel that the trial court abused its discretion by admitting improper rebuttal evidence. I also agree with Judge GRIFFIN's conclusion that the error was not harmless.

II

"Rebuttal testimony may be used to 'contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or

impeach the same.' " *People v Kelly*, 423 Mich 261,
281; 378 NW2d 365 (1985), quoting *People v DeLano*,
318 Mich 557, 570; 28 NW2d 909 (1947), cert den 334
US 818 (1948). The other generally applicable rule[4]
governing the admission of rebuttal testimony is that
"the device of eliciting a denial on cross-examination
may not be used to inject a new issue into the case.
Similarly, cross-examination cannot be used to revive
the right to introduce evidence that could have been,
but was not, introduced in the prosecutor's case in
chief." *People v Losey*, 413 Mich 346, 352; 320 NW2d
49 (1982), citing *People v Bennett*, 393 Mich 445, 449;
224 NW2d 840 (1975). This rule against division of
the prosecution's evidence is well established in our
case law. See *People v Quick*, 58 Mich 321, 322-323; 25
NW 302 (1885), setting forth the rule that the pros-
ecution may not divide the evidence supporting its
case by saving some of it for rebuttal.

III

A

I am persuaded, as were all three judges on the
Court of Appeals panel, that the trial judge's admis-
sion of the police reports and ex parte injunctions as

---

[4] The majority refers to my alleged "insinuation" that *the* test for
whether rebuttal evidence was properly admitted is whether that evidence
could have been offered in the prosecutor's case in chief. *Ante*, p 399. This
aspect of the majority's analysis is regrettable in three respects.

The word "other" signifies to any objective reader that the referent of
that word, in this case the word "rule," is only one of two applicable rules.

Second, the majority's alternative statement of *the* rule conveniently
ignores the fact that I had already cited the rule that rebuttal evidence
must respond to evidence actually offered by the opposing party.

Finally, the majority neglects the fact that in support of my citation of
this "other generally applicable rule" I cite opinions of *this* Court (of both
recent and venerable vintage), whereas the majority relies on decisions of
the intermediate appellate court.

rebuttal evidence was clearly erroneous. The prosecutor offered the police reports "for the purpose to rebut [defendant's] testimony. He said that they were peaceful together during the period of July through January." The court then ruled: "I will allow that for that purpose . . . because he indicated they were reconciling during that period of time and they were friendly."

As the transcript excerpt clearly shows, the trial judge mistakenly characterized defendant's testimony. Defendant testified that he was *trying* to reconcile with his ex-wife, not that they were in fact reconciling.[5] And, more importantly, in response to the prosecutor's statement, "You were friendly with Linda [defendant's ex-wife]. You were on a good, congenial, happy relationship with her in July," defendant immediately responded, "No, we weren't. Our relationship ever since our separation has been quite rocky. Our whole marriage for the last few years has been quite rocky."

Defendant never indicated that he and his ex-wife were friendly. In fact, his testimony was directly contrary to the trial judge's characterization of it. Therefore, the trial judge committed a clear error and his admission of the rebuttal evidence was an abuse of discretion.

The majority cites an excerpt from defendant's testimony on direct examination that contains the following exchange:

"*Q.* Did you ever try to reconcile with Linda?

---

[5] This is true of defendant's testimony on both direct and cross-examination. See majority opinion, *ante*, pp 395-396.

"*A.* Oh, yes. We tried to reconcile a number of times, and what would seem to happen was that we would get back together and it would be ten, twenty days or so and we would be separated again." [*Ante,* p 395.]

Unaccountably, however, the majority ignores defendant's actual words and asserts that he "testified at length that he and [his ex-wife] *were* reconciling . . . ." (Emphasis added.) *Id.,* p 397. The majority notes defendant's statement that the interludes of attempted reconciliation were "just like being back in my marriage," *id.,* p 398, but alters defendant's meaning by asserting that defendant "described these times in a favorable light," *id.,* thereby putting its own idyllic gloss on defendant's statement, a gloss not borne out by the actual marital history, as the majority is aware: "Unfortunately, the marriage was a troubled one . . . ." *Id.,* p 393. On the basis of defendant's actual testimony and intended meaning, the evidence at issue here was improperly admitted.

B

Plaintiff's argument that even if the police reports and ex parte injunctions were improperly admitted as rebuttal evidence, their admission was proper under MRE 404(b) and *People v VanderVliet,* 444 Mich 52; 508 NW2d 114 (1993), is without merit. Plaintiff asserts that this "evidence was relevant to Defendant's motive, the truth of his testimony on direct examination, and credibility of the complaining witness."

Even assuming the admitted rebuttal evidence is relevant to motive (which I do only for purposes of this analysis), it would still violate the prohibition

against division of the prosecution's evidence. And because, as plaintiff is obviously well aware, "[t]he ex-wife's refusal to release Defendant's property back to him, and Defendant's knowledge that his ex-wife was dating another man provide motive for Defendant to commit the [alleged] assault," the rebuttal evidence constitutes "needless presentation of cumulative evidence," and, in this case, "its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403.

The same analysis applies to the alleged admissibility of this evidence as being relevant to the issues of the truthfulness of defendant's testimony on direct examination and the credibility of the complaining witness.

The mere fact that the complainant filed ex parte police reports and obtained ex parte injunctions does not directly rebut any portion of defendant's testimony. That testimony was that they were "*trying* to reconcile," always unsuccessfully, and not, as the majority would have it, that they had in fact reconciled and recovered some never-existent connubial bliss. Furthermore, the reports and injunctions are substantively inadmissible because they are hearsay. And to the extent the evidence at issue here relates to the credibility of the complainant, who was called as a witness only in the prosecutor's case in chief, it violates the rule of *Losey, supra,* and is therefore improper.[6]

---

[6] The majority's contention that *Losey* and *Bennett* are "simply not relevant to the case at hand," *ante,* p 401, cannot stand unless one accepts the majority's characterization of defendant's testimony.

IV

Plaintiff argues that the issue of the admission of the ex parte criminal injunctions is not properly before this Court because defendant failed to object specifically to those documents. Were I forced to confront this argument, I would find defendant's objection readily discernible from the relevant context.[7] MRE 103(a)(1). However, I rely on the following provision of the Michigan Rules of Evidence:

> Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court. [MRE 103(d).]

A

This Court recently acknowledged "that the distinction between issue preservation and harmless error has not been clearly defined." *People v Grant*, 445 Mich 535, 552; 520 NW2d 123 (1994). We then established a rule "which first requires assessing the merits of an issue presented for the first time on appeal," *id.*, and ultimately held that "a plain, *unpreserved* error may not be considered by an appellate court for the first time on appeal unless the error could have been decisive of the outcome . . . ." *Id.* at 553 (emphasis in original). Therefore, because witness credibility

---

[7] Referring to the criminal injunctions, defense counsel stated:

> If they are in fact admissible in regards to what she is trying to impeach, then I will not object.

The injunctions, like the police reports, were offered to rebut defendant's alleged testimony that he and his ex-wife were "friendly" or *"peacefully living together"* during the relevant periods of time. As already noted, this characterization of defendant's testimony, subscribed to by the trial judge, the prosecutor, and the majority of this Court, is erroneous.

was the crucial factor in the evidence presented to the jury, I would hold that the plain error committed by the trial court could have been decisive of the outcome. Accordingly, this issue is properly before this Court. See also *People v George*, 213 Mich App 632; 540 NW2d 487 (1995), holding that substantial rights of the defendant were affected because credibility was the critical issue.

The majority misreads the rule articulated in *Grant*. The standard is not whether the error *was* decisive of the outcome (as the majority would have it), *ante*, p 402, but whether the error *could have been* decisive of the outcome (as five members of this Court established in *Grant*, 445 Mich 553). And regardless of the standard used, the majority's application of it would be flawed because of the improper incursion on the exclusive realm of the factfinder: evaluation of credibility. The majority quotes prosecution witnesses at length and simply asserts that the testimony of these witnesses substantially and irrefutably disproves defendant's version of events. This is an inappropriate exercise of appellate review.[8]

---

[8] In support of the improper conclusion that "the error was not decisive of the outcome," the majority also emphasizes that "[i]t is undisputed that defendant broke into complainant's home. Defendant himself admitted this fact." *Ante*, p 402. The majority then dramatically concludes that "there can be little dispute that defendant violently broke into complainant's bedroom." *Id.*, p 403. It is of course true that defendant admitted breaking into his ex-wife's home. However, the majority's inference that this fact is probative of defendant's alleged intent to commit felonious assault is wholly inappropriate, as indeed is any inference by an appellate court from facts that can support an alternative theory. In this case, defendant's admitted act of breaking into the home is equally probative of his theory that he was merely attempting to reclaim items of his personal property. This is especially true in the specific factual context of this case where it is equally undisputed that there were items of defendant's personal property in the home and that defendant was refused admission into the home.

B

In determining whether the trial court's plain error was harmless, "[o]ur responsibility is to determine how the error might have affected the jury's decision. The inquiry is 'what effect the error had or reasonably may be taken to have had upon the jury's decision.' " *People v Young (After Remand)*, 425 Mich 470, 505; 391 NW2d 270 (1986). If it is clear that the erroneous admission of the evidence did not prejudice defendant, then the error is harmless. *Id.* And the burden of proving that defendant suffered no prejudice must be borne, as it has been since the formulation of the original common-law harmless error rule, by the beneficiary of the error. See *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967), stating that, at common law, the "beneficiary of the error [had] either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment."

C

This case presented a classic credibility contest. In quantitative terms, defendant was at an obvious disadvantage because he was the sole witness testifying in support of his version of events, while the prosecution had the complainant and three other persons with obvious loyalties to the complainant as witnesses. Therefore, defendant's credibility was the crux of his defense, a fact that heightens the prosecutor's burden to prove that there clearly is no reasonable possibility that the challenged evidence might have contributed to the conviction.

I would hold that plaintiff has not met its burden. I think it manifestly reasonable to assume that the offi-

cial nature of "police reports" and "criminal injunctions" might cause the average juror to give such evidence substantial credence, which, in this case, would have significantly undermined defendant's credibility, thereby contributing to the conviction. And I also think it reasonable to assume that the jurors would not be aware of the ex parte nature of these documents.

The majority opines that the jury could not have improperly used this erroneously admitted evidence "because of the cautionary instruction given by the trial judge." *Ante*, p 400. The judge instructed the jury as follows:

> I want to make something clear to the jury. It gets confusing here. These restraining orders—He is not charged with violation of the restraining order. He is not charged with any violation in connection with that. That's a different matter. That's a different court. The only purpose that these restraining orders were offered and the only reason I allowed them—*to rebut his testimony that he said that we were reconciling and were getting along fine.* That's the only purpose they're offered as to what was filed. [Emphasis added.]

In fact, this instruction virtually ensured that the jurors would improperly use this evidence because it instructed them to treat the evidence as substantive proof rebutting defendant's consistently mischaracterized testimony.

D

My opinion in this regard should not be read as an assertion that the improperly admitted evidence *did* contribute to the conviction, but, rather, only that plaintiff has failed to meet its burden of proving that

it is clear there is no reasonable possibility that this improperly admitted evidence might have contributed to the conviction. Accordingly, the trial court's error was not harmless.

V

I would reverse the decision of the Court of Appeals and remand this case to the trial court for a new trial.

BRICKLEY, C.J., and LEVIN, J., concurred with CAVANAGH, J.