*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　　Plaintiff-Appellee,

v

DRACO LEE JONES,

　　　　　　Defendant-Appellant.

UNPUBLISHED
February 7, 2019

No. 339435
Wayne Circuit Court
LC No. 16-010260-01-FC

Before: MURRAY, C.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals his jury trial convictions of assault with intent to commit murder, MCL 750.83, carrying a weapon with unlawful intent, MCL 750.226, being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. For the reasons set forth below, we affirm.

## I. FACTS AND PROCEDURE

This matter arises from the shooting of Kevin McCotter on November 4, 2016. McCotter and defendant had known each other for approximately three years because they lived in the same neighborhood. McCotter also knew defendant's two brothers, Andre Long and Mondale Jones. McCotter testified that he was scheduled to testify in a criminal case against Jones on November 7, 2016.[1] According to McCotter, approximately two weeks before the shooting, defendant approached him at a gas station wanting to talk about the events surrounding Jones's criminal case. McCotter said that he told defendant that he could not speak to him about it and described defendant's behavior as "shady" because defendant never bought anything from the gas station before leaving.

---

[1] Jones's criminal case concerned a shooting with a .40 caliber Glock 19 that belonged to McCotter.

McCotter testified that on November 4, 2016, he noticed that his vehicle had a flat tire. His girlfriend, Sierra Burkes, drove him to his mother's house to look for a car jack and then back to his vehicle at his apartment complex sometime before 8:00 p.m. McCotter testified that, as soon as he got into his car, he saw defendant walking toward him from the apartment complex parking lot across the street. According to McCotter, defendant walked up to his passenger side window and shot one bullet—using a "black Glock"—through McCotter's car window, hitting him in the right arm. Burkes was waiting for McCotter in her vehicle. She testified that she saw an individual standing close to McCotter's vehicle fire a shot at him. Burkes did not see the shooter's face but she said that the gun was black and "it looked like a Glock." Burkes testified that the shooter ran away after shooting at McCotter. At the hospital, McCotter identified defendant by name as the shooter. On November 9, 2016, McCotter identified defendant as the shooter from a six-person photographic array.

Defendant called two witnesses as part of his defense—Long and Mikhail Roseman. In opening statement, the prosecutor asserted that Long, defendant's brother, was working as a security guard at McCotter's apartment complex at the time of the shooting. Initially, Long testified that he was not working on November 4, 2016. He later testified that he worked at McCotter's apartment complex for approximately two months, but was transferred to another apartment complex by the time of the shooting. At one point, Long testified that he was "probably working," or at home asleep, but could not be sure. Long also testified that he did not have any contact with defendant on November 4, 2016, or speak with McCotter before the shooting.

The defense called Roseman as an alibi witness. Roseman testified that defendant came over to his house around midday on November 4, 2016, to do some laundry and that defendant remained at his house until 2:00 a.m., drinking and celebrating Roseman's birthday. Roseman's younger brother, Malachi Spight was also there, but did not stay the entire night. Roseman testified that a few other friends were at the party, but did not provide their full names at trial. According to Roseman, the only time that defendant left his house was when he and defendant went to a liquor store around 11:00 p.m.

The prosecution called four rebuttal witnesses: Detective Jason Mays, Corporal Ki Sobel, Champine Evans, and Spight. Detective Mays testified that he interviewed defendant on November 11, 2016. Through Detective Mays, the prosecution admitted a portion of defendant's police statement into evidence. The prosecution then asked Detective Mays to read aloud defendant's answer to his question about where defendant was around 7:35 p.m. on November 4, 2016. Defendant answered:

> I don't know. I was maybe at Champagne's [sic] house on Goddard near Dequindre or at a friend's house, St. Aubin between Nevada and Seven Mile.

During cross-examination, defendant pointed out that Detective Mays only read a portion of defendant's police statement to the jury, and that defendant's police statement was three pages long. Defendant moved to admit his entire police statement and requested Detective Mays to read defendant's entire police statement into the record. The prosecution objected, arguing that it was only introducing a portion of defendant's police statement to contradict Roseman's testimony regarding defendant's alibi. The trial court ruled that defendant's entire police

statement be admitted into evidence, but the court did not allow Detective Mays to read defendant's entire police statement for the purposes of saving time.

Evans, the mother of defendant's children, testified that in November 2016 she and defendant lived in an apartment together. On March 3, 2017, Evans spoke with a detective about the events of November 4, 2016. Evans told the detective that on November 4, 2016, she saw defendant early in the morning before she left for work and again around 3:30 p.m. when she returned home from work. According to Evans, defendant left to do laundry at Roseman's house shortly after 3:30 p.m. Evans saw defendant again later that evening, but could not remember the specific time that defendant returned home.

Spight testified that he lives with Roseman and that on November 4, 2016, defendant came over to his house sometime between 1:00 p.m. and 2:00 p.m. to hang out. Spight testified that some other friends were also hanging out in Roseman's bedroom, which was located in the basement. Spight went upstairs around 7:00 p.m., but went back downstairs around midnight to wish Roseman a happy birthday. According to Spight, defendant was still in Roseman's bedroom when he came back downstairs. When Spight went back upstairs, around 4:00 a.m., defendant was still at the house. Spight did not know whether defendant left the house between 7:00 p.m. and midnight.

## II. JURY OATH

Defendant first argues that he is entitled to a new trial because the trial court ignored the indication by some jurors that they were unable to swear or affirm the oath and allowed those jurors to remain on the panel for the duration of defendant's trial. We disagree.[2]

The juror's "oath imposes on the jurors three duties: (1) to justly decide the questions submitted, (2) to render a true verdict, and (3) to do these things only on the evidence introduced and in accordance with the instructions of the court." *People v Cain*, 498 Mich 108, 121; 869 NW2d 829 (2015) (quotation marks omitted). The purpose of the juror's oath is to ensure "that the jurors pay attention to the evidence, observe the credibility and demeanor of the witnesses and conduct themselves at all times as befits one holding such an important position." *Id*. at 121-122, quoting *People v Pribble*, 72 Mich App 219, 224; 249 NW2d 363 (1976).

---

[2] Defendant failed to object to the trial court's alleged failure to properly swear in the jury, and therefore, the issue is unpreserved for appellate review. See *People v Cain*, 498 Mich 108, 114; 869 NW2d 829 (2015). We review an unpreserved claim that the trial court failed to properly swear in the jury under the plain-error standard. See *id*. at 117. In order to satisfy that standard, the defendant must show "(1) an error occurred, (2) the error was 'plain'—i.e., clear or obvious and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected." *Id*. at 116 (citation omitted).

We have reviewed the record and conclude that, contrary to defendant's claim, the trial court properly swore in the jury and ensured that all of the jurors were able to swear or affirm the oath. At the start of trial, the trial court instructed the jury as follows:

I will now ask you to raise your right hand and swear to perform your duty to try the case justly and to reach a true verdict. If your—if your religious beliefs prevent an oath, you may do the same thing by affirming.

Ladies and gentlemen, this is your oath.

The trial court proceeded to swear in the jury:

*The Court*: Each of you do solemnly swear or affirm that in this action now before the court you will justly decide the question submitted to you, that unless you are discharged by the court from further deliberations, you will render a true verdict and that you will render your verdict only on the evidence introduced and in accordance with the instruction of the court, so help you God?

*Prospective Jurors*: (Silence.)

*The Court*: Please either swear or affirm that oath by saying yes.

*Jurors En Masse*: Yes.

*The Court*: All right. Thank you. Please put your hands down. Anybody not able to swear or affirm that oath.

*Jurors En Masse*: Yes.

*The Court*: All right. No one has raised their hand.

All right. Am I alright with—is everybody okay? Okay. Let me know.

There was no objection to the trial court's administration of the oath, and neither party disputes that the correct oath was given. See MCR 2.511(H)(1). Defendant's argument concerns the indication by some jurors that they were unable to swear or affirm the oath. As correctly pointed out by the prosecution, defendant fails to acknowledge the relevant portion of the record. The trial court asked, for a second time, whether there were any jurors who were unable to swear or affirm the oath, and made clear, on the record, that no jurors raised their hand to indicate that they were unable to swear or affirm the oath. In sum, the record does not support defendant's assertion that there were jurors at his trial who were unable to swear or affirm the oath. Therefore, defendant fails to demonstrate that an error occurred, and he is not entitled to a new trial.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that he was denied the effective assistance of counsel because defense counsel failed to raise certain objections, introduce cellular telephone data analysis, and

ballistics evidence, and prevented defendant from testifying at trial. We disagree and will review each of these arguments.[3]

To establish a claim of ineffective assistance of counsel, defendant must demonstrate that defense counsel's performance fell below an objective standard of professional reasonableness, and that there is a reasonable probability that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different. *People v Grant*, 470 Mich 477, 485-486; 684 NW2d 686 (2004). There is a strong presumption that defense counsel's decisions constitute sound trial strategy. *People v Foster*, 319 Mich App 365, 391; 901 NW2d 127 (2017). Counsel is presumed to be effective, and a defendant bears a heavy burden to demonstrate otherwise. *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004).

Defendant first argues that he was denied the effective assistance of counsel because defense counsel failed to object when some jurors indicated that they were unable to swear or affirm the oath. As discussed, the trial court properly administered the juror's oath and the entire jury was able to swear or affirm the oath, and therefore, any objection by defense counsel would have lacked merit and been unsuccessful. Trial counsel's failure to make a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant next argues that defense counsel failed to object to the prosecution's rebuttal witnesses and that this rose to the level of ineffective assistance. Defendant concedes that defense counsel objected to the prosecution playing his telephone calls from jail, but faults defense counsel for failing to specifically object on grounds that all of the prosecution's rebuttal witnesses were improper. Defense counsel presumably decided not to object to the rebuttal witnesses because, arguably, their testimonies helped defendant's alibi theory as Malachi Spight and Champine Evans both testified that defendant was at Mikhail Roseman's house on the night of November 4, 2016, which was consistent with Roseman's testimony. Defendant's police statement was also somewhat consistent with the testimonies of Spight, Evans, and Roseman because defendant told Detective Jason Mays that he may have been at Evans's house on November 4, 2016. Given that the prosecution presented evidence that partly benefitted defendant's alibi theory, it was well within reason of defense counsel to withhold an objection. See *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008) ("[D]eclining to raise objections can . . . often be consistent with sound trial strategy."). Moreover, defense counsel had an opportunity to cross-examine each of the rebuttal witnesses, and was able to highlight that there were multiple witnesses who testified that defendant was at Roseman's house at the time of

---

[3] Because no evidentiary hearing was held before the trial court, our review of defendant's claims of ineffective assistance of counsel is limited to the facts contained in the existing record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). Whether effective assistance of counsel has been denied is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews questions of constitutional law de novo, and factual findings, if any, are reviewed for clear error. *Jordan*, 275 Mich App at 667.

the shooting. Defendant fails to demonstrate that defense counsel's performance was objectively unreasonable on this ground.

Defendant next argues that defense counsel failed to introduce a ballistics report providing that the bullet recovered from McCotter's arm was a .38 caliber bullet, which defendant asserts is inconsistent with a Glock. Defendant asserts that defense counsel should have introduced the report in response to McCotter's and Burkes's testimonies that the shooter used a Glock, which would have suggested "that other mistakes may have been made, including the identity of the shooter." Defendant's argument is unavailing. First, McCotter and Burkes are not firearms experts; they merely expressed their opinions as to what type of gun the shooter was carrying. Burkes stated that she did not know the gun's caliber. McCotter said only that the gun resembled one he owned. There was no testimony regarding the various caliber handguns made by Glock. And given that the handgun used to shoot McCotter was never recovered and so not available for testing, arguments concerning whether the bullet's caliber matched the caliber of the weapon were of little weight.

Defendant also argues that he was denied the effective assistance of counsel because defense counsel failed to introduce cell phone records to show that he was not present at the crime scene and did not call Long that day. Defendant's brief offers no evidence that such records exist or that they corroborate his alibi testimony. Nor does defendant offer proof that the purported records were available to his counsel. Instead, defendant claims only that "some analysis of his phone was included in the discovery materials provided by the prosecution's office." That is not sufficient to justify reversal or remand. See MCR 7.211(C)(1)(a)(ii). Moreover, defendant was able to submit alibi evidence through the testimony of witnesses.

Lastly, defendant asserts that he wanted to testify at trial, but was unprepared to do so. However, this is inconsistent with the record. Defendant was sworn and thoroughly voir dired by the court regarding his decision whether or not to testify. He confirmed that he understood his right to testify, that he had discussed the matter with counsel, and that he did not wish to testify.

## IV. PROSECUTORIAL MISCONDUCT

Defendant next argues that he is entitled to a new trial because the prosecution attempted to admit only one part of his police statement and called four improper rebuttal witnesses, thereby constituting prosecutorial misconduct. We disagree.[4]

---

[4] We review issues of prosecutorial misconduct de novo to determine whether the defendant was denied a fair and impartial trial. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). Claims of prosecutorial misconduct are evaluated on a case-by-case basis, and this Court must consider the prosecution's comments in context. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

Defendant first argues that the prosecution's attempt to admit only a portion of defendant's police statement was a violation of the rule of completeness, thereby constituting prosecutorial misconduct.

The rule of completeness is derived from MRE 106, which provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." MRE 106 would only be relevant in this case if the trial court denied defendant's request to have a complete writing or recorded statement introduced. See *People v McGuffey*, 251 Mich App 155, 161; 649 NW2d 801 (2002). Because the trial court granted defendant's request to admit his entire police statement into evidence, the rule of completeness was not violated. Moreover, the prosecution's attempt to introduce a portion of defendant's police statement was well within the court rule because defendant had an opportunity to admit the remainder of his police statement.

Defendant further argues that the prosecution committed prosecutorial misconduct because the prosecution attempted to prevent defendant's entire police statement from being read to the jury. However, it was the trial court, not the prosecution that determined that a full reading of defendant's police statement was unnecessary because the jurors could read defendant's police statement themselves. Thus, any claim that the prosecution engaged in misconduct in this regard fails.

Finally, defendant argues that the prosecution engaged in misconduct by calling four "improper" rebuttal witnesses. Rebuttal evidence, which is evidence that explains, contradicts, or otherwise refutes an adversary's evidence, is admissible to undercut the adversary's case. *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996). Rebuttal evidence is appropriate so long as it is "properly responsive to evidence introduced or a theory developed by the defendant." *Id*.

Similar to defendant's contention regarding MRE 106, this claim of prosecutorial misconduct is misplaced because the trial court allowed the prosecution's rebuttal witnesses to testify. "Admission of rebuttal evidence is within the sound discretion of the trial judge . . . ." *Id*. at 398. It is within the trial court's discretionary authority to define the scope of rebuttal and to preclude defendant's trial from turning into a trial of secondary issues. *Id*. Thus, defendant cannot show that the prosecutor committed misconduct when the trial court allowed the rebuttal witnesses to testify.

Moreover, permitting the four rebuttal witnesses to testify was proper because they were called to introduce evidence in response to defendant's alibi theory based on Roseman's testimony that defendant was at Roseman's house on the night of the shooting. Each rebuttal witnesses presented evidence regarding defendant's whereabouts on November 4, 2016. Detective Mays was called to lay a proper foundation for defendant's police statement, which showed that defendant was confused about his whereabouts on November 4, 2016. The prosecution also called Corporal Ki Sobel to lay a proper foundation for the recordings of a telephone call between defendant and another individual who were discussing defendant's activities on November 4, 2016. Evans was called to present evidence that defendant was at her house and Roseman's house on November 4, 2016. Spight was called as a rebuttal witness, and

questioned about whether he knew where defendant was between the hours of 7:00 p.m. and midnight on November 4, 2016. These witnesses provided testimony challenging defendant's alibi claim and their testimony was properly admitted.

Affirmed.

/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro