*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 2, 2020

Plaintiff-Appellee,

v

No. 349222
Wayne Circuit Court
LC No. 18-004808-03-FC

JACARTA JENNINGS,

Defendant-Appellant.

Before: STEPHENS, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, mutilation of a dead body, MCL 750.160, and possession of a firearm during the commission of a felony (felony-firearm). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without parole for the felony-murder conviction, and concurrent prison terms of 40 to 60 years for the armed robbery conviction and 30 to 45 years for the mutilation of a dead body conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. BACKGROUND FACTS

Defendant and a group of men participated in the robbery and fatal shooting of Christopher Thompson while he sat inside his GMC Yukon parked in the driveway of a friend's home at 10297 East Outer Drive in Detroit during the early morning hours of January 3, 2018. After the shooting, the perpetrators returned to the scene and set the Yukon on fire destroying the vehicle and severely burning Thompson's remains.

Police obtained surveillance videos from a nearby BP service station and from two private residences located on Outer Drive near the location of the crimes. The videos showed that persons in a dark van and a white Chevrolet Impala carried out the robbery and shooting. The BP station video recorded a dark-colored van and a white Chevrolet Impala meet after 2:00 a.m. Defendant and Carlos Thomas exited the Impala and entered the van. The van drove to Outer Drive and stopped at the east end of the block where three individuals exited and walked to the parked Yukon

-1-

and perpetrated the robbery and murder. They then returned to the waiting van which drove back to the BP station where defendant and another person exited the van and entered the Impala. The van then returned to 10297 East Outer Drive, followed by the Impala, where three persons exited the vehicles, set the Yukon on fire, then ran to the waiting vehicles which drove away.

As part of their investigation, the police released "Persons of Interest" videos to the local news media. Law enforcement identified several suspects including defendant, Thomas, Demonte Foster, Darnell Rush, and Jarrin Larry[1]. Sergeant Steven Ford interviewed defendant who identified himself in the BP station video but denied any involvement in the crimes. Larry testified at trial that he overheard Foster call defendant on the night of the crimes and tell him, "There's a play on the floor." Larry understood that to mean that Foster planned to commit a robbery. The robbery targeted a man in a truck parked on Outer Drive.

At trial, defendant testified on his own behalf. He explained that he lied during his police interview in response to numerous questions. In support of his alibi defense, he described his extensive movements during the night of January 2 and the morning of January 3, 2018. Defendant testified that he gave his Impala to Foster after midnight for help resolving an overheating problem and that Foster returned the vehicle after 2:00 a.m. Defendant admitted that he drove to the BP station with Thomas. He admitted that he parked his Impala and that he and Thomas got into Foster's van but explained that Foster then gave Thomas a ride home. Defendant admitted that after they returned to the BP station, he drove his Impala behind Foster's van around the time the Yukon fire happened, but he explained that he did so only because he thought he left his phone in Foster's van. Defendant stated that he followed Foster and honked his horn to get him to stop so that he could retrieve his phone. He admitted that he stopped behind the van but asserted that when he saw men running toward the van he left.

During cross-examination, the prosecution questioned defendant regarding his explanation about his movements the night of the incident. The prosecution showed defendant the BP surveillance video that showed his Impala at the BP station and defendant admitted that he drove there and that he and Thomas entered Foster's van. The prosecution showed defendant additional video footage that showed a white car circling in the vicinity of the crime location. Defendant denied that the surveillance video depicted his white Impala near the crime scene and asserted that the white car must have been someone else's vehicle. The prosecution also showed defendant a time line of events. Defendant challenged the prosecution's timing of events and pointed out what appeared to be a miscalculation of the time associated with one of the described events.

Defendant's girlfriend, India Griffin, testified in support of defendant's alibi. She explained that defendant and Thomas picked her and her sister up from her home and drove around eventually stopping at defendant's cousin's house at around 1:00 a.m. She testified that she forgot her cell phone at home. She stated that Foster arrived later in his van and after 20 minutes drove away in defendant's Impala. Griffin and defendant went to defendant's mother's house down the

---

[1] Foster pleaded guilty to second-degree murder, MCL 750.317, and felony-firearm. Thomas and Rush were tried jointly and convicted of first-degree felony murder and other crimes. Larry pleaded guilty of unarmed robbery, MCL 750.530, pursuant to a plea agreement under which he agreed to testify as a prosecution witness at defendant's trial.

street and got some money from her, then returned to the cousin's house and a while later Foster returned with the Impala about the time she left with her sister to go home because she had to work the next day. She admitted that she did not know what defendant did after she left for home. On cross-examination, Griffin could not explain why her phone records indicated that Foster called her phone a few times the night of the crimes.

After the defense rested, the trial court advised the parties that the jury asked for a map that detailed the locations of the places about which witnesses had testified regarding events that took place on the night of the murder. This took place on November 21, 2018, the Wednesday before Thanksgiving.

After the trial court excused the jury for the day, it took up the issue of the jury's seeking of a map and other information. The trial court advised the parties that if either side wished to move to reopen proofs to provide additional information it would exercise its discretion and allow them to do so. The prosecution indicated that it intended to offer rebuttal. The trial court stated that it would permit reopening of proofs to assist the jurors to do "a very difficult job." Following further discussions regarding this issue and jury instructions, the trial court recessed for the Thanksgiving weekend to resume the next Monday. When the trial resumed, the prosecution advised the trial court that it had rebuttal witnesses to address among other things the map issue. Defense counsel questioned whether such testimony would be proper rebuttal. The trial court responded that it had discretion to reopen the proofs in lieu of permitting the prosecution to present the evidence via rebuttal witnesses. Defense counsel opposed that. The trial court explained that, to assist the jury in understanding the case so that they could make a better determination whether the prosecution proved its case, it would reopen the proofs to permit the prosecution to present evidence.

Defense counsel then questioned the propriety of the proposed maps because they featured routes and time frames depicted for alternative travel routes to various locations. Defense counsel argued that the jury merely sought a map that showed locations but not in relation to the scene of the incident. The prosecution explained that it construed the jury's request as seeking a map that showed where persons traveled and how long it took them to do so on the night of the incident. The prosecution argued that the maps, prepared using the Google Maps application, provided relevant evidence that would enable the jury to consider defendant's trial testimony about his movements at specified times during the night of January 2 and 3. Defense counsel objected that the proposed maps suggested routes not based on witness testimony, and therefore, were merely based on speculation. The prosecution explained that the Google Maps application automatically suggested the optional routes and that the prosecution's witness would provide that information and inform the jury that the maps were prepared that morning. The trial court observed that the routes and times depicted on the maps went to the weight of the evidence and not admissibility because the maps depicted the locations in relation to one another accurately and the maps would assist the jury to understand the locations. The trial court ruled that the evidence had relevance and probative value that was not outweighed by unfair prejudice. The trial court ruled that the prosecution could introduce the maps if it laid a proper foundation.

The prosecution called Sergeant Steven Ford who testified that he reviewed the time line that he prepared based upon the surveillance videos and made a correction because he realized that he made a mistake regarding the video time and the actual time. The prosecution played in split

screen a portion of the surveillance video that depicted a white car near the scene of the crime on Outer Drive and the white car at the BP station. Sergeant Ford identified the white car in each video segment as defendant's Impala. Sergeant Ford testified that another white car drove into the BP station and parked but explained that that white car was not the Impala he tracked in the vicinity of the crime scene because defendant's Impala was distinguishable and could be identified by its three black rims and one wheel with a hubcap which differed from the other white car. He explained that he tracked defendant's white Impala from the Outer Drive area to an intersection and then to the BP station where Thomas and defendant exited the Impala and entered Foster's van. Next, Sergeant Ford explained that surveillance video showed the van parked on Outer Drive and three men walked up that street from the van. He testified that one of the persons walking from the van had clothing like Thomas as seen in the BP station surveillance video when he exited defendant's Impala and entered Foster's van.

Detective Keven Treasvant testified regarding several maps that he prepared to show where various places were located in relation to the activities on the night of January 2 and 3 as testified by various witnesses. He explained why the maps depicted alternative routes from one location to another and that the times identified for traveling the routes related to 9:30 a.m. that morning and not when the events of the night of the crimes occurred.

The defense recalled defendant to the stand. He acknowledged where one of the maps featured his mother's home on Beaconsfield and identified the location of his cousin's home on the same street. He also viewed the surveillance video from the BP station and identified Thomas as one of the individuals who climbed into Foster's van. Defendant reviewed the video clip of the three men who left the van near the crime scene and denied that Thomas was one of them and denied knowing the three men.

The jury convicted defendant of the charged offenses. This appeal followed.

## II. ANALYSIS

### A. REOPENING OF PROOFS AND REBUTTAL EVIDENCE

Defendant argues that the trial court abused its discretion by allowing the prosecution to reopen the proofs to present additional evidence and that the evidence was not proper rebuttal evidence. We disagree.

"Admission of rebuttal evidence is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *People v Figgures*, 451 Mich 390, 398; 547 NW2d 673 (1996) (citations omitted). "Rebuttal evidence is admissible to contradict, repel, explain or disprove evidence produced by the other party and tending directly to weaken or impeach the same." *Id*. at 399 (quotation marks and citation omitted). "[T]he test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant." *Id*. (citation omitted). "As long as evidence is responsive to material presented by the defense, it is properly classified as rebuttal, even if it overlaps evidence admitted in the prosecutor's case in chief." *Id*. Rebuttal evidence is proper when it serves as a "simple contradiction" of the defendant's testimony on the same subject.

*People v Vasher*, 449 Mich 494, 505; 537 NW2d 168, 173 (1995). Rebuttal evidence that focuses on a matter that is "material and relevant" is allowable to rebut a denial of the same by the defendant. *Id*.

We also review a trial court's decision whether to reopen proofs for an abuse of discretion. *People v Herndon*, 246 Mich App 371, 419; 633 NW2d 376 (2001). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Bergman*, 312 Mich App 471, 483; 879 NW2d 278 (2015), quoting *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). Trial courts have discretion to allow a party to reopen the proofs after having rested. *People v Solomon*, 220 Mich App 527, 532; 560 NW2d 651 (1996) (citation omitted). The trial court should consider "whether any undue advantage would be taken by the moving party and whether there is any showing of surprise or prejudice to the nonmoving party." *Herndon*, 246 Mich App at 420.

Defendant first challenges the admission of Sergeant Ford's testimony that he corrected a time line exhibit. The record reflects that during defendant's testimony he challenged the time line's accuracy and denied that the white car in the video footage was his Impala. The prosecution recalled Sergeant Ford who testified that the prosecution alerted him to a discrepancy between the video time and the actual time respecting when a white car circled near the crime scene. Sergeant Ford reviewed the surveillance videos and corrected the mathematical discrepancy without reinterpreting or changing the video. The corrected time line did not give the prosecution an undue or unfair advantage because it merely involved the correction of a miscalculation in the synchronization of the video time and actual time, but did not alter the video evidence. The trial court, therefore, did not abuse its discretion by permitting the prosecution to introduce this corrected evidence.

Defendant also argues that the trial court erred by admitting the video of his police interview with Sergeant Ford. The prosecution played the video in its case-in-chief but inadvertently did not seek its admission into evidence at that time. Defendant does not dispute that the jury could consider the video evidence in their deliberations since the jurors viewed it during the prosecution's case-in-chief. Because the jury had already viewed the video, admitting it into evidence after the prosecution rested and the trial court reopened the proofs did not give the prosecution an undue advantage or prejudice defendant. *Herndon*, 246 Mich App at 420. Accordingly, the trial court did not err by admitting defendant's police interview video.

Defendant argues that Sergeant Ford changed his testimony about the second white car depicted in surveillance video and the trial court should not have allowed him to do so. We disagree.

The record does not support defendant's contention that Sergeant Ford changed his testimony. In the prosecution's case-in-chief, Sergeant Ford testified that the surveillance videos depicted the movement of a white car which he identified as defendant's Impala. Defendant denied during his testimony that the white car visible in the surveillance videos was his car. In rebuttal, Sergeant Ford testified that he focused his initial testimony on defendant's Impala. He acknowledged that video footage depicted another white car. He described the differences between the two white cars in the surveillance videos. He specifically identified defendant's Impala by its three black rims and one wheel with a hubcap and explained that defendant's car's

wheels could be observed in the surveillance videos. He testified that the car circling on Outer Drive near the crime scene featured the single hubcap and other black rims. He pointed out that the other white car did not have the same wheel configuration which made it possible to differentiate defendant's white Impala from it. Sergeant Ford did not dispute defendant's testimony regarding observing two white vehicles, but clarified how the two white vehicles were visually distinguishable. Sergeant Ford's testimony rebutted defendant's testimony that the video placed the other white car near the crime scene. The trial court, therefore, did not abuse its discretion by permitting the introduction of this evidence.

Defendant further argues the trial court should not have permitted Sergeant Ford to testify that an enhanced video showed that a person dropped off on Outer Drive wore clothing that matched Thomas's clothes. This testimony rebutted defendant's testimony that Foster dropped Thomas off before the van returned to Outer Drive and the BP gas station. Sergeant Ford explained how the BP station's surveillance video showed Thomas's shoes and clothing and that he based the identification of Thomas in the footage on defendant's testimony that Thomas exited defendant's Impala and entered Foster's van ahead of defendant. Sergeant Ford testified that one could compare the BP video footage with the surveillance videos taken from the Outer Drive surveillance cameras. He explained that one of the men depicted in those surveillance videos could be seen wearing the same clothes as Thomas. Sergeant Ford's testimony rebutted defendant's testimony that he and Foster dropped Thomas off at his home and that he never went near the crime scene. Sergeant Ford's testimony explained how the evidence contradicted defendant's explanation for his movements on the night of the crimes and placed him at the scene contrary to his alibi defense. The trial court, therefore, did not abuse its discretion by permitting the prosecution's introduction of this evidence.

Defendant next argues that the trial court erred by admitting the map exhibits through Detective Treasvant's testimony because the maps were not produced during pretrial discovery. The court rules provide that a party upon request must provide "a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request." MCR 6.201(A)(6). "In Michigan, demonstrative evidence is admissible when it aids the fact-finder in reaching a conclusion on a matter that is material to the case." *People v Unger*, 278 Mich App 210, 247; 749 NW2d 272 (2008) (quotation marks, alteration, and citation omitted). Further, a map may be properly admitted into evidence to show locations even if the map contains some inaccuracies. *Tanis v Eding*, 274 Mich 288, 298; 264 NW 375 (1936).

In this case, the prosecution did not know that defendant would testify at trial or the content of his testimony regarding his movements the night of the crimes. Defendant testified about visiting multiple locations in Detroit and described a confusing trail of movements. The jury requested maps to assist understanding witnesses' testimony regarding the locations of events during the night of the crimes. Detective Treasvant testified that the maps identified several locations including Griffin's home location, defendant's mother's home, the BP station, the crime scene, and Thomas's home. Detective Treasvant testified that he prepared the maps that morning to show the locations about which various witnesses testified and that the maps depicted the locations defendant identified as points of his travels on the night of the crimes' commission. Because defendant's testimony elicited the request from the jury, the prosecution responded by providing the jury maps that clarified facts in issue. The maps provided relevant information that

could assist the jury in their effort to determine the facts. Defendant has failed to establish that the prosecution committed a discovery violation because the record reflects that it had not withheld the maps and only prepared the maps using the Google Maps application on the morning that the prosecution introduced the evidence to clarify the locations and to rebut defendant's alibi defense. The trial court's decision to allow the introduction of the maps served an important purpose to aid the jury in reaching its conclusions, and although they featured alternative routes of travel generated by the Google Maps application, those features were not offered to establish the roads traversed by defendant but to orient one location to another. The trial court correctly discerned that the maps had probative value and that features depicted on the maps went to their weight but not their admissibility. Therefore, the trial court did not abuse its discretion by permitting the prosecution to introduce the maps.

## B. PHOTOGRAPHS OF THE VICTIM

Defendant argues that the admission of three photographs depicting the victim's remains inside the burned truck unfairly prejudiced him. We disagree.

We review for an abuse of discretion the trial court's decision to admit this evidence. *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. In deciding whether the trial court erred in this case, we must determine whether the challenged evidence was unfairly prejudicial and if so whether the prejudice substantially outweighed its probative value. *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "All relevant evidence is admissible," unless prohibited by law. MRE 402. Even where evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[a]ll relevant and material evidence is prejudicial." *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018). Rather, "[i]t is only when the probative value is substantially outweighed by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). "The 'unfair prejudice' language of MRE 403 refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611 (quotation marks and citations omitted).

Trial courts have discretion to admit or exclude photographs. *Mills*, 450 Mich at 76. "Photographs are not excludable simply because a witness can orally testify about the information contained in the photographs." *Id*. Photographs also are not subject to exclusion merely because they are graphic or gruesome. *Id*. "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *Id*. In *Mills*, our Supreme Court explained:

> "Photographs that are merely calculated to arouse the sympathies or prejudices of
> the jury are properly excluded, particularly if they are not substantially necessary

or instructive to show material facts or conditions. If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. Generally, also, the fact that a photograph is more effective than an oral description, and to the extent calculated to excite passion and prejudice, does not render it inadmissible in evidence." [*Id*. at 76-77 (quotation marks and citations omitted).]

In this case, the first photo depicted the victim's charred upper body and the interior of the vehicle burned to the point that it revealed its metal support structure, the upholstery and plastic components having been completely destroyed. The second photo depicted the burned interior of the vehicle with a small portion of the victim's body visible in the right lower corner. The third photo depicted the victim's burned skull, neck, and upper torso. A crime scene investigator testified regarding 25 photos he took of the scene. He testified only briefly regarding the three photos that showed the victim's remains as he found them during the investigation. All three photos depicted the aftermath of the murder, the burning of the victim, and destruction of the Yukon.

Although graphic depictions of the crime scene, the photos were relevant to establish elements of the charged offenses including the perpetrators' intent to kill the victim, to ensure that he died if merely wounded by the gunshots, to mutilate the body beyond recognition, and to destroy evidence. The photos negated any argument that the victim's murder and the destruction of the victim's body occurred accidentally. Further, the photos established beyond doubt that the perpetrators intended to kill the victim, eliminate any possibility of survival, and destroy as much evidence as possible to conceal the crimes. Although the photos were graphic, they were highly probative of material issues at trial. They served to explain the perpetrators' conduct and established elements of the crimes of homicide and mutilation of the body. The three photos were not unreasonably duplicative and were displayed briefly. The record does not reflect that the photos aroused the passion or prejudice of the jurors. Under the circumstances of this case, the photos' probative value substantially outweighed the danger of unfair prejudice. The trial court, therefore, did not abuse its discretion by admitting the photographs.

## C. AUTHENTICATION OF THE VIDEOS

Defendant argues that the trial court erred by admitting the surveillance videos on the ground that the prosecution failed to properly authenticate them under MRE 901(a). We disagree.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). At trial, Sergeant Ford explained where and how the video recordings were obtained from surveillance cameras, the manner in which during his investigation he determined the time of recording by comparing his cell phone's time with the cameras' clock times, and the adjustments he made to correct inherent inaccurate time signatures

in the surveillance videos. He clarified how he coordinated the video recordings' time signatures with the actual time. He determined that the BP station surveillance video accurately displayed the actual time of the events it recorded because that surveillance camera displayed the correct time. He determined that the other surveillance cameras' clocks displayed slightly inaccurate times when compared with his cell phone's time. His testimony established that the videos of the events were what they purported to be. The video footage recorded events as they occurred the night of the crimes. He also explained that the compilation video and time line were prepared without alteration of the video evidence but synchronized to be time accurate. The prosecution made available to defendant all of the videos so that defendant had the opportunity to scrutinize the original recordings, compare them to the compilation video and time line, and analyze the method used by Sergeant Ford. Defendant had the ability to determine the reliability of the video recordings. Sergeant Ford's testimony sufficed to support a finding that the videos were what the prosecution claimed, and therefore, he properly authenticated and identified the evidence. The videos were admitted into evidence to assist the triers of fact in performing their duties. Accordingly, the trial court did not abuse its discretion by admitting the surveillance videos, the compilation video, and time line.

## D. CELL PHONE EXTRACTION EVIDENCE

Defendant argues that the prosecutor should not have been permitted at trial to introduce cell phone extraction records, Exhibits 49 and 50, because these exhibits were not produced during pretrial discovery in violation of the trial court's discovery order. We disagree.

"We review a trial court's decision regarding the appropriate remedy for a discovery violation for an abuse of discretion." *People v Dickinson*, 321 Mich App 1, 17; 909 NW2d 24 (2017). The trial court's factual findings are reviewed for clear error. *People v Mazzie*, 326 Mich App 279, 288; 926 NW2d 359 (2018).

A party upon request must provide "a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request." MCR 6.201(A)(6). In this case, before trial, the prosecution produced to the defense full printouts of all of the material extracted from defendant's and Griffin's cell phones. Defense counsel admitted receiving the printed material including the pages that showed the web searches persons conducted using the phones.

Exhibits 49 and 50 consisted of two sets of documents selected from the bulk of extracted information from defendant's and Griffin's cell phones. The exhibits showed that the cell phones were used after 5:00 a.m. on January 3, and again on January 6, to conduct Internet searches for articles related to a body burned inside a vehicle in Detroit. The trial court correctly found that no discovery violation occurred because defendant received a copy of all material extracted from the cell phones. Despite the volume of the cell phone extraction documents produced by the prosecution, defendant had the opportunity to review the documents to determine what might be relevant and introduced at trial. The prosecution hid nothing from defendant and merely selected portions that circumstantially linked defendant to the crimes. The prosecution did not violate its discovery obligations. Therefore, the trial court properly admitted the evidence and did not abuse its discretion in this regard.

## E. SENTENCING

Defendant argues that he is entitled to resentencing because the trial court erroneously scored sentencing guidelines Offense Variables (OVs) 3 and 5. Defendant objected to the trial court's scoring of OV 3 at sentencing, but did not object to the scoring of OV 5. Therefore, defendant preserved his claim of error respecting OV 3, but failed to do so regarding OV 5.

We review for clear error a preserved claim of error regarding a sentencing court's scoring of a sentencing guideline variable. *People v Lockett*, 295 Mich App 165, 182; 814 NW2d 295 (2012). "A scoring decision is not clearly erroneous if the record contains any evidence in support of the decision." *Id*. (quotation marks and citation omitted). The sentencing court's factual determinations used for sentencing under the sentencing guidelines must be supported by a preponderance of the evidence and are reviewed for clear error. *People v Dickinson*, 321 Mich App at 20. A sentencing court's factual determinations are clearly erroneous if this Court is left with a definite and firm conviction that a mistake was made by the sentencing court. *Id*. We review de novo a sentencing court's interpretation and application of the sentencing guidelines. *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004).

We review for plain error an unpreserved claim of error regarding a sentencing court's scoring of a sentencing guideline variable. *People v Chelmicki*, 305 Mich App 58, 69; 850 NW2d 612 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citations omitted). If the defendant meets his burden, "an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks, citations, and alteration omitted).

Although the sentencing guidelines serve only an advisory function, the trial court must consult the guidelines and take them into account at sentencing. *People v Lockridge*, 498 Mich 358, 391; 870 NW2d 502 (2015). OV 3 is scored for all felony offenses involving physical injury to a victim. MCL 777.33. Under MCL 777.33(1)(a) and (2)(b), sentencing courts must assess 100 points for OV 3 if a victim was killed and the death resulted from the commission of a crime, and homicide is not the sentencing offense. Defendant contends that the trial court erred by assessing 100 points for OV 3 and should have assessed only 25 points. Under MCL 777.33(1)(c), 25 points may be assessed if the victim suffered life threatening or permanent incapacitating injury.

The record reflects that the trial court sentenced defendant as a fourth-offense habitual offender and scored the guidelines for defendant's conviction of armed robbery in violation of MCL 750.529, a Class A offense under MCL 777.16y. The trial court did not assess defendant points for OV 3 in relation to his felony-murder conviction. It correctly explained at defendant's sentencing that guidelines scoring is not required for a felony-murder conviction which carried a life without parole sentence. The trial court assessed defendant 100 points for OV 3 in relation to defendant's conviction of armed robbery because Thompson's death resulted from the commission

of that offense. The trial court, therefore, did not abuse its discretion by assessing 100 points for OV 3.

Defendant also argues that the trial court erred by assessing him 15 points for OV 5 rather than 0 points. OV 5 is properly scored at 15 points where a member of the victim's family suffered "[s]erious psychological injury requiring professional treatment." MCL 777.35(1)(a). Zero points are scored where no such injury occurred. MCL 777.35(1)(b). MCL 777.35(2) provides, "Score 15 points if the serious psychological injury to the victim's family may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive."

At sentencing, the victim's sister spoke of the victim's kindhearted nature and his family's heartbreak at his loss. She stated that the family would always miss him, and she specifically reported that the victim's young daughter "was robbed of growing up with her dad by her side at every stage of her life." The evidence did not indicate that any member of the family had required treatment for any psychological injury yet, but the evidence regarding the victim's family's anguish at their loss and particularly his daughter's loss indicated that a family member may require professional treatment in the future. Accordingly, the trial court did not abuse its discretion by assessing 15 points for OV 5. Therefore, plaintiff has failed to establish that the trial court committed plain error. Further, the record reflects that, even if the trial court erred and 15 points are subtracted from defendant's total OV score of 170 points, his score would still exceed 100 points which would again place him in OV Level VI, the highest level for Class A offenses. MCL 777.62. Thus, the correction of the alleged error would not affect defendant's guidelines range. When a scoring error does not affect the appropriate guidelines range, a defendant is not entitled to resentencing. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien
/s/ James Robert Redford