*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEFFERY SCOTT PLOMB,

        Defendant-Appellant.

FOR PUBLICATION
September 18, 2025
1:21 PM

No. 368608
Wexford Circuit Court
LC No. 2023-013485-FH

Before: MARIANI, P.J., and MALDONADO and YOUNG, JJ.

YOUNG, J.

This case presents us with a novel application of existing case law. *People v Stevens*, 498 Mich 162, 170-178; 869 NW2d 233 (2015) sets forth factors to consider in determining whether a trial judge's conduct pierced the veil of judicial impartiality. *Stevens* laid out this multi-part test in the context of a judge intervening at trial in front of a jury. Here, we apply the *Stevens* factors to determine whether a judge pierced the veil of impartiality outside the presence of the jury at a jury trial. A judge *can* pierce the veil of impartiality outside the presence of the jury, and did so here, but here it did not amount to plain error affecting defendant-appellant, Jeffrey Scott Plomb's, substantial rights. We affirm Plomb's conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Traverse Narcotics Team (TNT) used a confidential informant (CI) to conduct a controlled buy with Plomb. After the CI texted Plomb that he wanted to "buy $40," TNT gave their CI marked cash and a police-owned vehicle, and trailed him as he went to Plomb's house. When the CI exited Plomb's residence, he had a Ziploc bag that he placed in the vehicle's cupholder. The police followed their CI to a designated location where they retrieved the Ziploc bag. That bag was sent to the Michigan State Police forensics laboratory. The material in the bag tested positive for methamphetamine.

Plomb was arrested and charged for his sale of methamphetamine to the CI. Plomb's jury trial was understandably brief—jury selection, all witness testimony, opening and closing arguments, and the jury verdict are under 275 transcript pages in total. The critical witness, the only eyewitness and the recipient of the sale of methamphetamine, was TNT's CI. The CI testified

as the prosecution's first witness that he purchased methamphetamine from Plomb and knew Plomb prior to that purchase. The CI did not testify how he knew Plomb but did explain that he knew how to contact Plomb because the CI "had his number from previous." The CI testified that he met with TNT officers, received $40 in marked bills, was searched, wired, and then drove to Plomb's residence where the CI "handed [Plomb] the money" and Plomb "handed it [the meth] to me." Plomb requested some items from the corner store and the CI left, purchased those items, gave them to Plomb, and returned to the same corner store to meet up with TNT officers. The TNT officers obtained a "small Ziploc baggie" from the CI that the CI believed contained methamphetamine.

Trial defense counsel, for his part, did what he could to sow doubt in the jury's mind. He began cross-examination by highlighting that the CI got involved with TNT because the CI was "caught with possession of methamphetamine." While nothing was promised to the CI for his cooperation, he was "hoping for a break . . . some leniency." At the time of trial, the CI had yet to be charged with any offenses and admitted he was "selling out Mr. Plomb" with the hope of benefitting from his cooperation with TNT.

Trial defense counsel also addressed the text exchange between Plomb and the CI, specifically, that it did not contain the word "methamphetamine" or a slang equivalent. The CI admitted that he "did not specify what the $40 was for." Then, trial defense counsel addressed the actual buy and the search preceding it. The CI testified that while he was patted down by officers, they did not remove his shoes or socks. They provided the CI with a wire but no video recording equipment. Trial defense counsel also brought up the CI's two prior convictions for theft or dishonesty—larceny and uttering and publishing. Then, trial defense counsel asked, "[H]ow are you familiar with methamphetamine?"

The prosecutor, seemingly observing that this was already covered with his earlier admission to previously possessing methamphetamine, objected, saying: "Objection, your honor. I think that's already been answered." Rather than respond to this objection, the trial court dismissed the jury, explaining to the jurors that he was seeing "three other pitfalls" that he had to discuss with the attorneys. The jurors left, but the CI remained on the witness stand and Plomb remained in the courtroom at defense counsel table.

After the jury was excused, the trial court told the CI to "just sit there" while the judge and attorneys "do a little bit of talking." The trial court went on: "You're getting ready to ask him how does he know? Now, I'm probably going to ask him a question and that is, what did you mean by getting $40? And then I'm going to ask him how did you know $40 meant meth. Has [the CI] ever purchased from Mr. Plomb before in the past?" The CI answered, "yes," seeming to believe the trial court was questioning him. The trial court went on:

> Is that going to be relevant and admissible? You just asked him how he knew about methamphetamine. You know you've opened the door; right? He can talk about any time he's ever purchased methamphetamine from Mr. Plomb before. You've opened the door, and therefore any rule of evidence underneath 404B now is admissible. I just want you to realize. I saw this happening. When you were focusing on those questions regarding what $40 meant, he's going to be asked questions now, how did you know $40 meant meth, and his answer is probably

going to be "I've purchased from him in the past." And now you've just asked him how is he familiar with meth? Do you realize you've opened the door and now any incident he ever bought from Mr. Plomb is now admissible? Let's take a moment and we're all going to take a recess, but that's a big that's a big issue. I'm going to let you counsel figure it out, but I'm going to allow any questioning regarding any incidents that he's ever purchased from Mr. Plomb in the past. Thank you. We're in recess.

After a five-minute recess, and with the jury still out of the courtroom, the trial court asked the parties "[W]hat are we going to do?" At first, defense counsel asked to strike the question. The court said, "Nope. You've already opened the door . . . ." The court then stated that the prosecutor could "ask [the CI] questions about any time he's ever purchased from Mr. Plomb" and, according to the court, that testimony's probative value outweighed its prejudicial effect.

Then, defense counsel tried to correct the record, explaining: "I believe I just asked about the $40." The Court asked the CI "[W]hy did you just say $40?" The CI replied that he and Plomb "never talked about much over the phone." The trial court inquired further—"how did you know that he meant—that the two of you were talking about meth?" The CI explained, "[B]ecause that was the normal conversation between the two." The trial court responded with "Bingo" and again stated that he would allow the prosecutor to ask those questions. He further opined that trial counsel had "a really big ineffective assistance of counsel issue." The trial court clarified counsel knew the CI had previously purchased from Plomb and "intentionally walked into and opened a huge door . . . that was a huge mistake." In the end, the trial court allowed defense counsel to withdraw his last question—"how are you familiar with methamphetamine?"—but the prior questions about the text messages remained.

On redirect, and now in the presence of the jury, the prosecutor did as the trial court advised and asked: "[W]hy did you use that language [I need $40]?" The CI also answered as he had practiced with the trial court—"Because that was what I'd normally buy . . . from Mr. Plomb." He testified that he bought from Plomb in the past and this type of language used in the text message was the "normal conversation" between them.

The jury then heard from both TNT officers who assisted with this controlled purchase. They testified that they did not see their CI make any additional stops and were consistently within 10 yards of the vehicle they loaned their CI. They agreed they did not personally observe the purchase between the CI and Plomb and that they did not search the CI's shoes. They testified they seized methamphetamine from the CI immediately following the purchase from Plomb. The jury also heard from the officers who transported the baggie of methamphetamine for testing and from the Grayling Forensic Laboratory employee who confirmed the substance in the Ziploc bag obtained from the CI was methamphetamine. There were no witnesses for the defense.

Before instructing the jury, the trial court dismissed the jury to address the parties once more. The trial court explained that while Plomb's prior sales to the CI could not be used for propensity evidence, they could be used for a common plan or scheme and were admissible because "the door was opened by the defense." Following closing arguments, the jury convicted Plomb after less than an hour of deliberations.

Defense counsel filed a motion for new trial citing the questioning of the CI outside the presence of the jury and alleging that Plomb's Sixth Amendment right to a fair trial was violated because the trial court interfered with Plomb's cross-examination of a key witness. The trial court denied that motion. On appeal, appellate defense counsel again focuses on that portion of the transcript but instead raises two separate issues: (1) the trial court erred by admitting other acts evidence or (2) defense counsel was ineffective for opening the door. Before oral argument, this Court issued a focus order to the parties, stating:

> On its own motion, the Court orders the parties to be prepared to discuss at oral argument the exchange between the trial court and the parties at Jury Trial Transcript pages 146-151 and whether the trial court's conduct during this exchange amounts to judicial bias and/or interference. See, e.g., [*Stevens*, 498 Mich at 170-178] (setting forth factors to be considered in determining whether a trial judge's conduct pierced the veil of judicial impartiality); *People v Davis*, 216 Mich App 47, 49-50; 549 NW2d 1 (1996) (outlining the limited situations in which a trial court may interject itself into the trial). [*People v Plomb*, unpublished order of the Court of Appeals, entered May 1, 2025 (Docket No. 368608).]

This Court also permitted supplemental briefing, which only the prosecution filed.

## II. APPELLANT'S ARGUMENTS

As our focus order indicated, this Court is interested in whether the trial court's conduct amounted to judicial bias or interference. In advance of addressing that, we briefly address the arguments raised by appellant in this Court.

## A. THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF PLOMB'S PRIOR DRUG TRANSACTIONS BUT IT WAS NOT OUTCOME DETERMINATIVE

The prosecution attests that the defense opened the door to other acts evidence. We disagree.

As an initial matter, asking a CI, who has a history of methamphetamine use and possession and who became known to the police for the same, how they are familiar with methamphetamine is not opening the door to questions on prior bad acts of the *defendant*. *People v Wilder*, 502 Mich 57, 67 and n 15, 68 and n 16, 69 nn 17-18; 917 NW2d 276 (2018). Counsel also did not open the door with his questions preceding the knowledge-of-methamphetamine question, which the trial court incorrectly recalled. The trial court summarized the relevant portion of cross-examination as: "When you were focusing on those questions regarding what $40 meant, he's going to be asked questions now, how did you know $40 meant meth, and his answer is probably going to be 'I've purchased from him in the past.' " But this is not an accurate summary of defense counsel's cross-examination. Counsel asked if the CI used the word "methamphetamine" or a slang equivalent in the text exchange or had any additional context beyond a request for "$40." The CI testified he did not. There was no further inquiry.

The prosecution cites to *People v Bates*, 91 Mich App 506, 510; 283 NW2d 785 (1979), where, in opening arguments and in Bates' own testimony, he denied participating in the delivery

of a controlled substance. The prosecution also cites to *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996), another case in which the defendant denied the accusations in his own testimony. In *Bates* and *Figgures*, the prosecution confronted the defendant with prior bad acts evidence and this Court did not find any error. Here, as the prosecution summarized in their briefing in this Court: "trial counsel's opening statement contended the jury would not hear the word 'methamphetamine' or any slang term for the drug." This is different than an outright denial of participation for two reasons: (1) it is a discrete, accurate observation of the factual record—the text exchanges do not mention methamphetamine; and (2) it is done without accompanying testimony and context from Plomb.

Unlike the broad conclusions in opening arguments and testimony from the defendants in *Bates* and *Figgures*, this is a "discrete, straightforward, and uncontroversial question[] of fact." *People v Thorpe*, 504 Mich 230, 254; 934 NW2d 693 (2019). "To maintain that th[is] basic question[] *invited* the prosecution to" discuss Plomb's prior criminal acts on redirect of the CI would "require defense counsel to read tea leaves before asking any questions." *Id*.

Because the trial court erred in concluding defense counsel opened the door, the trial court likewise erred in failing to analyze the admissibility of Plomb's prior acts. We agree with the prosecution that had the trial prosecutor properly filed an other-acts notice and requested their admission, these prior bad acts would have been admissible as a common plan or scheme. MRE 404(b). The prosecutor did not provide that requisite notice, however, and the court—likely due to its erroneous conclusion that defense counsel opened the door to the evidence—did not account for that failure. Furthermore, the court failed to complete a full MRE 403 balancing test. "Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice." *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010) (cleaned up). We think that because of the lack of context in the text messages, the evidence would have been more probative than prejudicial. Nevertheless, the trial court's failure to complete this assessment, or failure to accurately complete this assessment, is a procedural failure by the trial court. *People v Felton*, 326 Mich App 412, 424; 928 NW2d 307 (2018). In sum, the trial court made factual errors as to what questions defense counsel asked and then made a legal error—that defense counsel opened the door to other acts evidence. In making this legal error, the trial court compounded it by failing to complete a meaningful assessment of the other acts evidence under MRE 403 and 404. For these reasons, it was error to admit this other acts evidence.

While it was error to admit the other acts evidence, the question is whether absent the improperly admitted evidence, it is more probable than not that a different outcome would have resulted. *People v Gursky*, 486 Mich 596, 619; 786 NW2d 579 (2010). We agree with the prosecution that Plomb cannot meet this burden. This case was an uncomplicated application of mostly uncontested facts to law and it rose and fell on the credibility of the CI, on which Plomb's prior bad acts has little bearing. Plomb has failed to show that the erroneous admission of his prior bad acts was worthy of relief.

## B. DEFENSE COUNSEL WAS NOT INEFFECTIVE

For similar reasons to those supplied above, defense counsel was not ineffective. First, defense counsel's representation did not fall below a standard of reasonableness as defense counsel did not open the door to other acts evidence. *People v Armstrong*, 490 Mich 281, 290-291; 806 NW2d 676 (2011). Second, there is not a reasonable probability of a different outcome without the erroneously admitted evidence. *Id*.

But, Plomb's guilt or innocence is of no moment when this Court is analyzing judicial interference.

## III. JUDICIAL INTERFERENCE

To start, we acknowledge the factual uniqueness of the case before us. In this case, we address a judge's actions taken outside the presence of the jury at a jury trial. This Court's judicial-interference jurisprudence involves cases where the judge's bad conduct occurred in front of the jury at a jury trial. In *Stevens*, the Court "articulated the proper standard a reviewing court must apply" when determining "whether a trial judge's conduct pierced the veil of judicial impartiality": a "judge's conduct . . . violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct *improperly influenced the jury* by creating the appearance of advocacy or partiality against a party." *Stevens*, 498 Mich at 168-169, 171 (emphasis added). The Court went on to enumerate a non-exhaustive list of factors to consider in deciding whether a judge's conduct violates a defendant's right to a fair trial: (1) nature of the judicial intervention; (2) tone and demeanor; (3) scope of the conduct in light of the trial's complexity; (4) direction of intervention; and (5) curative instructions. *Stevens*, 498 Mich at 180-190. Applying these factors, the Court considered the impact on the jury, saying at one point, the first factor will "dovetail" with the second because "the manner in which the judge's inquiry is made will affect *how the jury perceives the conduct*." *Id*. at 186 (emphasis added). The Court also relied on caselaw that likewise involved judges questioning witnesses in front of a jury, e.g. *McMillan v Castro*, 405 F3d 405, 409-410 (CA 6, 2005) ("Actual impartiality as well as the appearance of impartiality is critical because the judge's every action is likely to have a great influence on the jury."); *Simpson v Burton*, 328 Mich 557, 563-564; 44 NW2d 178 (1950) ("Defendant complains of questions asked by the court of the witnesses . . . those questions . . . may well have unjustifiably aroused suspicion in the mind of the jury as to defendant's credibility . . . ."). After considering these factors, the Court held that the trial court's "repeated questioning of defendant's expert" amounted to invading the prosecutor's role and "projected incredulity, bias, and hostility." *Stevens*, 498 Mich at 186, 191. The Court granted Stevens a new trial.

A few years after *Stevens*, the Court decided *People v Swilley*, 504 Mich 350; 934 NW2d 771 (2019), which considered a trial judge's extensive questioning of the defense alibi witnesses in front of a jury. . Swilley, too, was awarded a new trial because the Court determined that the judge's questioning "*improperly influenced the jury* by creating an appearance of advocacy or partiality against the defendant." *Id* at 356 (emphasis added).

The Michigan Supreme Court has never addressed, at least not post-*Stevens*, judicial impropriety occurring outside the presence of the jury. From our research, we found only one

instance where this Court has addressed judicial actions occurring outside the presence of a jury and it was before *Stevens* and at a bench trial. There, this Court employed a similar standard when considering whether judicial bias impacted the proceedings: "By analogy, the court in a bench trial pierces the veil of judicial impartiality where its conduct indicates bias against or partiality toward a party, thereby denying the respondent a fair and impartial trial." *In re Harbin*, unpublished per curiam opinion of the Court of Appeals, issued March 31, 2011 (Docket No 296148), p 2.[1]

Setting this vacuum in our jurisprudence aside for a moment, it makes sense logically that a judge *could* pierce the veil of impartiality outside the presence of the jury at a jury trial. We all understand that a trial court cannot simply dismiss a jury and then conduct itself in any manner it chooses. This is because, as *Stevens* explained, the harm caused by a judge's interference at trial is not harm to the jury but to the "constitution of the trial mechanism." *Stevens*, 498 Mich at 168, citing *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991). Specifically, an unbiased judge is requisite to the promises of the Fourteenth Amendment and due process of law. *Tumey v Ohio*, 273 US 510, 523; 47 S Ct 237; 71 L Ed 749 (1927).

The fairness of trial and the process that is constitutionally due to a defendant are implicated when the jury is present and when they are excused. Here, we apply the multi-factor inquiry on judicial impropriety to behavior that occurred outside the presence of the jury at a jury trial. We do so without employing a presumption in favor of the trial court being unbiased as neither *Stevens* nor *Swilley* did so. See, *People v Layman*, 20 NW3d 565 (Mem) (2025) (CAVANAUGH, C.J., concurring in denial of leave).

## A. THE NATURE OF THE JUDICIAL CONDUCT

*Stevens* acknowledged that judicial misconduct comes in "myriad forms," some which may take place outside the presence of the jury, including "belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Stevens*, 498 Mich at 172-173. Importantly, we are not concerned with the *motive* of the trial court. Here, the trial court was seemingly motivated by an error it genuinely believed defense counsel had committed. But, the trial court was legally and factually incorrect about what occurred. And even if the trial court had been correct about defense counsel opening the door, the intervention occurred in a way that alleged defense counsel was constitutionally deficient and improperly provided strategic advice to the prosecution. *Swilley*, 504 Mich at 374 (explaining that "in an adversarial system, it is *the litigants' job*" to present their case to the jury) (emphasis added).

---

[1] Unpublished authorities are not binding on this Court but may be considered as persuasive authority. *People v Daniels*, 311 Mich App 257, 268 n 4; 874 NW2d 732 (2015). *Harbin* involved a juvenile bench trial wherein this Court held that "the referee's emotionally-charged comments . . . reflected poor judicial temperament" but did not warrant a new trial. *Harbin*, unpub op at 2-3.

In fact, the trial court behaved in a manner not wholly distinguishable from the judge in *Swilley*. In *Swilley*, the judge extensively questioned a defense witness and attempted to justify it by characterizing the testimony as confusing. It was not. Instead, "the judge rigorously questioned [the witness] in a manner that more closely resembled prosecutorial cross-examination, rather than a mere attempt at clarification." *Id*. at 375.

Here, while the judge did not actually resort to questioning the CI before the jury,[2] the judge laid out the specific questions for cross-examination and told the parties that these questions *would* be asked in front of the jury. And, on this record we find no indication that the prosecutor intended to ask about Plomb's prior bad acts. There was no 404(b) notice filed, the prosecutor did not use this information in opening or closing, and the prosecutor objected to defense counsel's cross-examination on the grounds of "asked and answered." As the judge pointed out at the end of trial, these decisions followed a preliminary examination that established a history of drug buys between Plomb and the CI. This information was known to the prosecution and they declined to use it. Just as credibility is squarely the responsibility of the jury, strategy is squarely the responsibility of the attorneys. This factor weighs in favor of concluding the judge pierced the veil of judicial impartiality.

## B. THE TONE AND DEMEANOR OF THE JUDGE

It is important to acknowledge here that all we have as the reviewing court is transcripts. We cannot say for certain what the judge's body language or tone were at the time of the interruption of trial. And, while we do earlier state that we think the judge was legally incorrect as to whether defense counsel opened the door, the factual and legal inaccuracies are not what is considered under this factor. What we can gather from the record reveals, as it did in *Swilley*, a "skeptical, confrontational approach." *Swilley*, 504 Mich at 383. More than once in front of Plomb, the CI, and the parties, the judge stated his belief that counsel was constitutionally ineffective in his representation of Plomb. The judge conducted his own examination of the CI to demonstrate the possible redirect for the prosecutor. Using the CI, and concluding questioning with "Bingo," reads more like making an example of defense counsel rather than a genuine teaching moment. It does not place the trial judge's demeanor in the best light. This factor, while difficult to gauge from the written record alone, slightly favors a determination that the trial court pierced the veil of impartiality.

## C. THE CONTEXT AND SCOPE OF THE JUDICIAL INTERVENTION IN LIGHT OF THE TRIAL'S COMPLEXITY

Simply put, "a review of the record confirms that the complexity of the issue[] presented did not warrant the extent of judicial intervention that occurred here." *Stevens*, 498 Mich at 188.

---

[2] Notably, at one point the judge did say he would do the questioning himself. After dismissing the jury, the judge stated, "You're getting ready to ask him how does he know? Now, *I'm probably going to ask him a question* and that is, what did you mean by getting $40? And *then I'm going to ask him* how did you know $40 meant meth. Has Mr. Nelson ever purchased from Mr. Plomb before in the past?" (Emphasis added.)

To be clear, the judicial intervention here was limited by comparison to the repeated questioning of witnesses in *Stevens*. But Plomb's single-charge, single-day trial was significantly less complex than Stevens' "eight-day murder and child-abuse trial involving testimony from several medical experts." *Id*. Arguably, the intervention in Plomb's trial was equally or more significant than that in Stevens' trial when we account for the much shorter trial length and the far less complex issue.

Here, it is helpful to visit one of the cases cited in our focus order to the parties: *Davis*, 216 Mich App 47. In *Davis*, this Court addressed a trial court's inquiry of party witnesses in front of a jury, but it cited approvingly a rule that is applicable to broader circumstances of judicial interference. There are "three situations in which a trial court has good reason to interject itself into the trial: (1) when the trial is lengthy and complex, (2) when attorneys are unprepared or obstreperous, or if the facts become confused and neither side is able to resolve the confusion, and (3) when a witness is difficult or not credible and the attorney fails to adequately probe the witness, or if a witness becomes confused." *Id*. at 49-50. When we consider Plomb's trial, none of these factors are met.

## D. DIRECTION OF INTERVENTION

On top of being unnecessary, the judge's interjection was legally and factually unsound in a way that favored the prosecution and dictated their strategy going forward. In addition to inviting the prosecutor to use unnoticed prior bad acts, the judge repeatedly undermined defense counsel and his relationship with Plomb, saying more than once that this was an "ineffective assistance of counsel issue." We have established above, it was not. Like in *Stevens*, 498 Mich at 189, the intervention was imbalanced and accordingly, this factor favors holding the judge pierced the veil of judicial impartiality. While we might agree with the prosecution when they state in their brief that the trial court's "aim was not to provide improper strategic advice to the prosecution," that was its effect.

## E. CURATIVE INSTRUCTIONS

"[T]he presence or absence of a curative instruction is a factor in determining whether a court displayed the appearance of advocacy or partiality." *Stevens*, 498 Mich at 177. Here, we agree with the prosecution that because the alleged judicial misconduct or interference took place outside the jury's presence, there was no need for a curative instruction. However, one could have been afforded as to the other acts evidence that was ultimately admitted as a result of the trial court's intervention. The trial court expressly advised *the parties* on the limited purpose of the other acts evidence and could have so advised the jury. However, Plomb's counsel did not request a limiting instruction. As a result, while largely inapplicable under the circumstances, this factor slightly favors a finding that the judge did not pierce the veil of judicial impartiality.

## F. TOTALITY OF THE CIRCUMSTANCES AND PLAIN ERROR

Looking at the factors above, the totality of the circumstances favor a finding that the judge here pierced the veil of judicial impartiality. And logically, that makes sense when we reflect back on the errors in *Stevens* and *Swilley*. It is difficult to distinguish the impact on a trial where a judge directly questions one party's witness versus where a judge directs strategy for one of the parties

in a way that results in the questioning of a key witness. Here, this strategic advising happened in a manner that was nonresponsive to the prosecutor's own objection and out-of-step with the prosecution's clear strategy with respect to prior bad acts (which was to not use them). It happened in a case that was narrow in scope, featuring almost wholly unquestioned police work and no defense witnesses. That said, this error is unpreserved. *People v Davis*, 509 Mich 52, 67-68; 983 NW2d 325 (2022). Defense counsel did not place an objection on the record outside the presence of the jury when these discussions were initially taking place, or in front of the jury when the prosecution ultimately questioned the CI about Plomb's prior bad acts.

As *Davis* provides, this unpreserved structural error requires Plomb to show that "(1) error occurred; (2) the error was plain, i.e. clear or obvious, and (3) the plain error affected substantial rights." *Id* at 67 (citation omitted). When the forfeited error is, as here, a structural one, the third prong is necessarily met. *Davis*, 509 Mich at 74. Then, Plomb must show that the "error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 68. Because of its overlap with the third prong, there is a formal presumption that this prong of the test has been met. *Id*. at 75.

Applying *Davis* here, the error was plain and obvious. The third prong—that the plain error affected substantial rights—is also met as this error is a structural one. Finally, as to the fourth prong, the prosecution tries to overcome the presumption that the fairness, integrity, or public reputation of judicial proceedings was seriously affected by emphasizing that Plomb was guilty and evidence of his guilt was untainted by this error. We agree but we also note that the fourth prong of plain-error review requires that we address integrity of judicial proceedings "independent of the defendant's innocence." *Id*. at 75 (citation omitted). The prosecution's "focus on the supposed absence of harm to defendant himself fails to consider the harm rendered to the integrity and public reputation of the trial." *Id*. at 78.

However, the prosecution also emphasizes that this exchange took place outside the presence of the jury. We see some merit in this point. That is not to say that the public reputation of judicial proceedings is not harmed when the jury is not present. It is. Plomb and the CI are both members of the public, as are their attorneys, and whoever else may have been present in the courtroom. The harm to the public was minimized by dismissing the jury of Plomb's peers though. We note it would have been further minimized had the CI been excused from the stand and this conducted as a bench conference, or better still, if the judge had simply responded to the prosecutor's objection and not intervened at all. But, we conclude that the harm to the public reputation of the judicial proceedings was minimized. Further, as outlined above, the evidence that came in was likely admissible (had the prosecutor taken the necessary steps to request its admission and had the court completed a full analysis under MRE 403 and 404.) This also diminishes the harm to the fairness of process and integrity of the outcome. Finally, as we stated earlier in this opinion, we are confident that the evidence did not influence the ultimate decision the jury reached in this case. The prosecution has overcome the presumption that this error affected the fairness, integrity, or public reputation of judicial proceedings because it occurred outside the presence of the jury, involved substantively admissible evidence, and did not implicate the integrity of Plomb's convictions.

## IV.  CONCLUSION

Outside the presence of the jury at a jury trial, the trial court unnecessarily intervened in a manner that then clearly changed the prosecution's strategy.  This occurred in a case that was simple: a single offense with overwhelming and nearly uncontroverted evidence of Plomb's guilt.  In interfering in this way in this case, the trial court plainly erred.  We nevertheless affirm because the plain error did not affect the fairness, integrity, or public reputation of the trial.

/s/ Adrienne N. Young
/s/ Philip P. Mariani
/s/ Allie Greenleaf Maldonado